### THE SOUTHERN PRINCE.
### UNITED STATES ex rel. LOURENZO et al.
### v. MASSAM.
### No. 2985.

District Court, E. D. New York.
July 11, 1933.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Herbert H. Kellogg and Albert D. Smith, both of Brooklyn, N. Y., of counsel), for the United States.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Delbert M. Tibbetts and Joseph F. Luley, both of New York City, of counsel), for the Master of the Southern Prince.

GALSTON, District Judge.

The relators are confined as prisoners on the steamship Southern Prince pursuant to an order of the Department of Labor signed June 14, 1933, and directed to the owner, agent, consignee, master, or officer in charge of the Southern Prince, commanding the relators to be detained on board and deported. The order was issued pursuant to the provisions of the Acts of February 5, 1917 (39 Stat. 874 [8 USCA § 101 et seq.]), December 26, 1920 (41 Stat. 1082 [8 USCA § 170]), and May 26, 1924 (43 Stat. 153 [8 USCA § 201 et seq.]) and the Immigration Rules issued by the Secretary of Labor thereunder.

In the original notice served on the respondent, no specific reasons were given, but in the copy filed by the inspector with the United States Department of Labor there appears the notation: "Have not established that they do not intend to abandon their calling as seamen."

On the petition of Antonio Pinto, who represents himself as a close personal friend of the alien relators, a writ of habeas corpus issued to the master of the Southern Prince, directing him to produce the relators before this court. A return to the writ of habeas corpus was filed by the United States attorney of this district, and there was also filed a traverse to the return.

The relators, natives and citizens of Portugal, signed articles in New York City on January 25, 1933, to ship as seamen on the steamship Southern Prince. They were employed for a period not exceeding six months, and were to be paid off and discharged at the port of New York.

Prior to the arrival on June 14, 1933, the vessel had made two round trips to South American ports.

On the return of the second voyage, when the ship arrived at New York, investigation by the inspectors of the Department of Labor led to the conclusion that these relators had assisted a stowaway on the vessel to enter the United States. Accordingly, the master of the vessel was ordered to detain and deport the relators. He detained them, and endeavored to deport them on a voyage from New York to Argentine. The authorities of that country would not permit the master to land the relators. There remained then nothing for the master to do but to transport them back to New York. On the arrival here on June 14th, the orders of detention and deportation in question were issued to the master.

It is difficult to see what the master can do with these seamen. There is no doubt that in good faith he did everything that was possible for him to do to comply with the order of May 6, 1933. The vessel is again about to leave for Argentine. There is no reason to suppose that the master will be any more successful in executing the order of deportation on this voyage than he was on the preceding one. In the circumstances, can he be compelled to make a jail of his vessel and continue purposelessly to carry them to his port of destination in Argentine and then, perforce, return them to this country?

It would seem that the orders issued to the master are predicated on the assumption that the Southern Prince brought these aliens to the United States. There is no proof of that fact. They were in the United States at the time of the signing of the ship's articles. There is ample power under the immigration laws to exclude these seamen; but whether Portuguese subjects signing on at New York for service on a vessel of British registry must be carried by that vessel to a port outside the United States may well be doubted.

The government relies on United States ex rel. Stapf v. Corsi, Commissioner of Immigration, 287 U. S. 129, 53 S. Ct. 40, 77 L. Ed. 215. It appears from that case that an alien seaman had entered the United States irregularly in 1923, but under the three-year limitation of the Immigration Act of 1917, § 34 (8 USCA § 166), was not subject to deportation; in 1929 he signed as a member of a crew of an American vessel for a round-trip voyage to Germany. Some time after his return he was arrested for deportation as an alien who had remained here in violation of the Immigration Act of 1924. On these facts it was held that the relator's arrival in the United States in April, 1929, "was an entry into this country notwithstanding he was a member of the crew of an American ship which had made a round trip voyage. He came from a place outside the United States, and from a foreign port or place, within the meaning of the immigration laws; United States ex rel. Claussen v. Day, 279 U. S. 398, 49 S. Ct. 354, 73 L. Ed. 758."

But to argue from that proposition to the proposition that the American ship on which he had made that round trip voyage

could be compelled to deport him is quite another matter; and the case does not stand as such authority. Indeed, there is some indication of the contrary, for it was said:

"The statutes requiring the master of a ship, under penalties, to bring back to the United States a seaman who signs for a round trip voyage are said to make the entry of April 1929, lawful. The argument, in substance based upon the theory that an American vessel is American soil, was effectively answered, as respects the requirements of the Immigration Acts, in the Claussen Case, supra. Irrespective of any statutory duty to return the seaman to this country, the petitioner's entry would have been lawful had he complied with the provisions of statute and regulation for temporary sojourn as an alien seaman. The obligation of the master to return him did not, as contended, confer the right to remain here permanently."

The dilemna in which the master of the ship is placed is set forth in the case of Matsutaka v. Carr (C. C. A.) 47 F.(2d) 601, 602: "Furthermore, as pointed out in the Okada Case, the master of the vessel was placed between two fires. If he refused to return the seaman to his home port, as stipulated, he incurred a penalty, and if he did return him he incurred a heavier penalty. A hazardous choice, to say the least. Here, the plight of the master was even worse. The appellant shipped for a voyage from San Diego, Cal., to Mexican waters and return. No foreign port was named, and it is questionable, at least, whether any foreign port or place was in fact entered. The master returned the seaman to the home port as agreed, but was not permitted to land him. Nor, so far as we are advised, could he discharge him elsewhere without his consent. Ordinarily, the master can return an alien to the port at which he embarked; but the place of embarkation here was in the United States, not in a foreign port or place. It would seem therefore that the master has the appellant on his hands for all time, unless the latter consents to go to some other port or place. Under such circumstances, and even conceding the right of deportation after landing, it would seem that the appellant is unlawfully deprived of his liberty."

No case is cited, nor have I been able to find one, which holds that in the particular circumstances shown in this proceeding the master of the Southern Prince should be compelled to make another abortive effort to deport the relators. Of course, in reaching this conclusion it does not at all follow that they are not subject to deportation.

The writ will be sustained.

Settle order on notice.