## UNITED STATES LINES CO. v. SHAUGHNESSY.

United States District Court
S. D. New York.
June 20, 1951.

Kirlin, Campbell & Keating, New York City, Delbert M. Tibbetts, New York City, of counsel, for plaintiff.

Irving H. Saypol, U. S. Atty., New York City, John M. Cunneen, New York City, of counsel, for defendant.

SUGARMAN, District Judge.

The plaintiff United States Lines Company commenced this action against W. F. Watkins, Director of Immigration and Naturalization Service of New York, for a declaratory judgment, an injunction, and money damages. Subsequently, by stipulation entered into between the attorneys for the respective parties, Edward J. Shaughnessy, District Director of Immigration and Naturalization Service of New York, was substituted as party defendant.

Plaintiff complains that at divers times during 1947 and 1948 Immigration Inspectors acting under § 20(a) of the Immigration Act of 1924, 8 U.S.C.A. § 167(a), issued notices to detain and deport, as aliens, members of the crews of vessels being operated by the plaintiff, who had been employed by the plaintiff at ports in the United States on round voyages to ports outside of the United States and return to ports of the United States on articles that provided for their discharge and payment of wages at such ports.[1]

---

1. Proof was adduced that Albert Lutz, born in and a citizen of Switzerland, was ordered detained at New York by notice dated October 29, 1948. He was deported to Belgium on December 30, 1948. Mohamed A. G. Mahmoud, born in and a citizen of Egypt, was ordered detained at New York by notice dated October 31, 1948. He was given shore leave on re-hearing November 3, 1948. Julio G. Dias, born in and a citizen of Portugal, was ordered detained at New York by notice dated April 8, 1948. The notice was withdrawn on April 15, 1948, on production of a newly issued passport. Joao Rocha Carola, born in and a citizen of Portugal, was ordered detained at New York by notice dated March 27, 1948. The notice was withdrawn on March 29, 1948. Henrique Martins D'Almeida, born in and a citizen of Portugal, was ordered detained at New York by notice dated July 29, 1948. After missing ship, he had returned on the S. S. America as a workaway and departed from the United States on the same vessel on August 4, 1948. Nick Colovis, born in and a citizen of Greece, was ordered detained at Norfolk by notice dated April 8, 1948. He was released on a writ of habeas corpus. Tage Birger Hoglund, born in and a citizen of Sweden, was ordered detained at New York by notice dated April 26, 1947. He was returned to the master on May 8, 1947 and sailed foreign. William Rohdenburg, born in Germany and a citizen of the United States, was ordered detained at New York by notice dated July 18, 1947. He was later conceded to be a citizen. John G. Staniszew-

The names of these seamen appeared on crew lists visaed by a United States consul. After receipt of the notices to detain and deport such seamen, plaintiff had them transferred to Ellis Island, in some instances, but as a condition to such transfer, plaintiff was required to execute a written undertaking that it would pay all expenses of transportation to the detention station, maintenance expenses at Ellis Island and that it would effect the deportation of the seamen at its expense. Plaintiff alleges that if such aliens were not legally in the United States when they signed shipping articles, it was not aware of it. Plaintiff claims that a continuance of the practice will result in irreparable injury, expense and damage to it for which it has no remedy in the ordinary course of law.

Plaintiff seeks a declaratory judgment against the District Director of Immigration and Naturalization at New York to determine whether that officer may legally authorize the issuance of such orders to detain and deport alien seamen who have been engaged in the United States as members of the crew of an American vessel for round trip voyages to a foreign port and return under shipping articles that provide for their discharge and payment at the end of the voyage at a port in the United States. Plaintiff also seeks an injunction restraining the District Director from such practice in the future. Plaintiff also demands recovery of amounts paid by it for detention and maintenance expenses of the fourteen seamen (identified in note

1 supra) which amounts were paid by plaintiff as a result of such orders to detain and deport. Plaintiff contends that § 20(a) of the Immigration Act of 1924, 8 U.S.C.A. § 167(a) should not be construed so as to give such authority to the District Director in the case of alien seamen making such round trip voyages from the United States on American vessels. Plaintiff further contends that the conduct of the defendant and his predecessor estops him on equitable principles and claims that he should be enjoined from issuing notices to detain and deport in cases of this type even if § 20(a) grants such power to the immigration authorities.

The defendant pleads that there is a lack of jurisdiction over the subject matter inasmuch as defendant is not a proper party, and inasmuch as plaintiff has failed to join an indispensable party, namely, the Treasurer of the United States, and defendant pleads that there is no actual controversy and that plaintiff has an adequate remedy at law.

The Court finds that plaintiff has appropriately pleaded facts which show that there is an actual controversy existing which calls for a declaration of the rights and other legal relations of an interested party. 28 U.S.C. § 2201; F.R.Civ.P. 57, 28 U.S.C.

Disposing first of the question of estoppel, the Court finds no merit in the claim that defendant and his predecessor are estopped from issuing notices to detain and deport under the facts peculiar to this case because of inequitable conduct. United States

sky, born in and a citizen of Poland, was ordered detained at Baltimore by notice dated October 8, 1947. He was released on writ of habeas corpus subject to deportation if that country to which he is deportable will accept him. Luciano R. Perez, born in and a citizen of Uruguay, was ordered detained at Baltimore by notice dated December 23, 1947. He was deported on April 12, 1948. Raymond Maurice Aube, born in and a citizen of France, was ordered detained at New York by notice dated February 6, 1948. He was released on rehearing after issuance of a passport on February 19, 1948. Alvaro Carlos DaSilva, born in and a citizen of Brazil, was ordered detained at San Francisco by notice dated February 19, 1948. He was deported on

grounds other than those on which he was detained on June 18, 1948. Felipe Felix Arce, born in the Philippines and a citizen of the United States, was ordered detained at New York by notice dated July 20, 1947. The notice was withdrawn on July 25, 1947. George T. Totolos, born in and a citizen of Greece, was ordered detained at New York by notice dated April 8, 1948. His application for suspension of deportation was still pending at the time of trial. The notices to detain and deport were issued on various grounds including that the aliens were not bona fide seamen, failed to have proper papers including passports, had made prior illegal entries, were afflicted with a disease or had been previously deported.

ex rel. Roovers v. Kessler, 5 Cir., 90 F.2d 327; Lloyd Royal Belge Societe Anonyme v. Elting, 2 Cir., 61 F.2d 745.

Prescinding for the present from the other defenses raised, the question before the Court may be stated as follows:—Does § 20(a) of the Immigration Act of 1924 authorize the immigration officer in charge to issue a notice to detain and deport an alien seaman on his arrival as a crewmember of a vessel at a port of the United States when that alien had signed his shipping articles in the United States for a round trip voyage on an American vessel? The section reads as follows: 8 U.S.C.A. § 167 "(a) Detention of seamen on board vessel until after inspection; detention or deportation; penalty; clearance to vessels. The owner, charterer, agent, consignee, or master of any vessel arriving in the United States from any place outside thereof who fails to detain on board any alien seaman employed on such vessel until the immigration officer in charge at the port of arrival has inspected such seaman (which inspection in all cases shall include a personal physical examination by the medicial examiners), or who fails to detain such seaman on board after such inspection or to deport such seaman if required by such immigration officer or the Attorney General to do so, shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of $1,000 for each alien seaman in respect of whom such failure occurs. No vessel shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the collector of customs."

■ In arriving at the intent of Congress, the courts are not to speculate as to the possible thoughts which might have been in the minds of the legislators when the statute was enacted. It is not for the court, acting upon conjecture and surmising what may have been the intent of the Congress, to interpolate exceptions in the statute, thus in effect avoiding and nullifying the express declaration of the act. On the contrary, the legislative intent is to be determined primarily from the language used in the act, read in connection with the canons of interpretation and surrounding circumstances. The language is generally construed according to its natural and most obvious sense, without resorting to an artificial or forced construction. Words of ordinary import receive their understood meaning, and technical terms are construed in their special sense. While the literal meaning of the statute may be avoided to effectuate the legislative intent, Congress is presumed to mean what it says, and if there is no ambiguity in the act, it is generally construed according to its plain terms. It would appear then, that the Congress, in enacting the section, intended that it apply to "any vessel arriving in the United States from any place outside thereof" and to "any alien seaman employed on such vessel". Therefore, unless compelling reason is shown to deviate from the common import attributable to the wording of the statute, Congress intended that the immigration authorities should have the power to order any alien seaman detained for inspection and deported at the ship's expense if the alien seaman is subject to deportation.

■ There can be no doubt that Congress has the power to impose such obligations or restrictions as it deems wise upon the entry[2] or re-entry of aliens into the United States. Chae Chan Ping v. United States (The Chinese Exclusion Case), 130 U.S. 581, 606, 9 S.Ct. 623, 32 L.Ed. 1068; Wong Wing v. United States, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed.

2. Whether the return to the United States of an alien seaman from a round trip voyage constitutes an "entry" has been contested in this action, but the answer to that is not decisive in construing § 20 (a). The question of "entry" has been the subject of judicial controversy when "entry" was decisive in deciding aliens' rights under other circumstances. The Southern Prince, D.C., 4 F.Supp. 190; United States ex rel. Claussen v. Day, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758; United States ex rel. Stapf v. Corsi, 287 U.S. 129, 53 S.Ct. 40, 77 L.Ed. 215.

140; Turner v. Williams, 194 U.S. 279, 289, 24 S.Ct. 719, 48 L.Ed. 979; Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 336, 29 S.Ct. 671, 53 L.Ed. 1013.

Congress may exercise this power by legislation requiring a vessel bringing in aliens found to be within an excluded class, to bear the expense of maintaining them while on land and of returning them, United States v. Nord Deutscher Lloyd, 223 U.S. 512, 517, 32 S.Ct. 244, 56 L.Ed. 531; United States v. New York & Cuba Mail S. S. Co., 269 U.S. 304, 46 S.Ct. 114, 70 L.Ed. 281.

Referring to the language of § 20(a), the statute applies to "any alien seaman" employed on "any vessel arriving in the United States from any place outside thereof". Therefore, the question whether these alien seamen made a technical "entry" into the United States on the arrival of their respective vessels is immaterial.

The Congressional Record shows that the 1924 Immigration Act was passed under pressure brought to restrict the entry into the United States of aliens. Many people favored a complete cessation of immigration, according to the remarks of the legislators, and it was sought to relieve the Government of the expense of deportation of undesireables by shifting that burden to the ships which brought inadmissible aliens to our shores.

The committee reports of the bill (HR 7995) show that § 20(a) was intended to provide an efficient barrier to the influx of aliens under the guise of bona fide seamen (Ho.Rep.No.350, 68th Cong. 1st Sess.).

A study of the proceedings on the floors of both houses of Congress, as recorded in the Congressional Record, sheds light on whether the legislature intended that the section apply to alien seamen who would temporarily depart from the United States on voyages in pursuit of their vocation. In its early form, the bill provided for the issuance of landing cards to alien seamen prior to their temporary admittance for shore leave or to seek a new berth. It was thought that possession of these landing cards by alien seamen would be a means of controlling them while on shore waiting to re-ship in pursuit of their calling. § 20(a) of the Johnson Act as submitted in the Conference Report to accompany H.R. 7995 (Ho.Rep.No.688, 68th Cong., 1st Sess.) read as follows: § 20(a) "Upon the arrival (after the expiration of four months after the enactment of this Act) of any vessel in the United States, it shall be the duty of the owner, agent, charterer, consignee, or master thereof to deliver to the immigration officer in charge at the port of arrival, in respect of each alien seaman employed on such vessel, a landing card in triplicate, stating the position such alien holds in the ship's company, when and where he was shipped or engaged, and whether he is to be paid off and discharged at the port of arrival, and such other information as may be by regulations prescribed, and having permanently attached thereto a photograph of such alien."

§ 20(d) thereof read as follows: "An alien seaman who departs from the United States temporarily at frequent intervals in the pursuit of his calling, or who is employed in a vessel touching at more than one port of the United States in the course of a continuous voyage, may be admitted to the United States, under such regulations as may be prescribed, without the requirement of a landing card in respect of each entry into the United States."

This latter subdivision certainly indicates that during the course of the passage into law of what is now 8 U.S.C.A. § 167, Congress had in mind alien seamen who departed temporarily from the United States with the intention to return. § 21(a) of the bill read as follows: "The owner, charterer, agent, consignee, or master of any vessel arriving in the United States from any place outside thereof who fails to detain on board any alien seaman employed on such vessel until the immigration officer in charge at the port of arrival has inspected such seaman, and delivered to him a landing card (in cases where a landing card is required), or who fails to detain such seaman on board after such inspection or to deport such seaman if required by such immigration officer or the Secretary of Labor to do so, shall pay to the collector

66

of customs of the customs district in which the port of arrival is located the sum of $1,000 for each alien seaman in respect of whom such failure occurs. No vessel shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the collector of customs."

§ 21(a) above is essentially the same as what ultimately became § 20(a) of the Immigration Act of 1924 when proposed § 20(a), providing for landing cards, was omitted for various reasons. Among these reasons was the fact that nothing could be done to prevent an alien seaman from destroying the landing card shortly after its issuance to him. Had Congress intended to except alien seamen shipping on such round trip voyages from the effect of § 20 as enacted, it is difficult to conceive why it was not expressly so stated.

In seeking out the true construction of § 20, the Court finds that the Supreme Court has passed on the construction and constitutionality of the Act of December 26, 1920, C. 4, 41 Stat. 1082 entitled "An Act To provide for the treatment in hospital of diseased alien seamen", 8 U.S.C.A. § 170, which is in pari materia with § 20(a), United States v. New York & Cuba Mail S.S. Co., 269 U.S. 304, 46 S.Ct. 114, 116, 70 L.Ed. 281. In reversing the Circuit Court, the Supreme Court found that that act, couched in language similar to § 20(a) of the Immigration Act of 1924, did impose a liability on the owner of an American vessel for the expense of treatment of a diseased alien seaman who had returned to the United States from a round voyage from New York to the West Indies. It is of note that the Circuit Court held that the statute could not be held to apply to seamen in circumstances closely analogous to those surrounding the seamen in the instant case because of that part of the Act requiring the vessel to bear the expense of return of such diseased alien if he was found incurable. The Circuit Court found it unreasonable to assume that Congress in-

tended to burden American vessels with the deportation of such an alien to his country of origin and therefore, the vessel's obligation, if any were imposed by the Act, would be a return to the port of departure, namely the domestic port at which he is persona non grata on arrival in his diseased condition. This same reason is stressed by plaintiff in the case at bar.

The Supreme Court nevertheless held that the legislature did intend that the Act include alien seamen employed on round trip voyages on American vessels and found that such burden on American shipping was not violative of the due process clause of the Fifth Amendment in that "it imposes liability without causation or causal connection".

The Court finds no compelling reason to deviate from the plain meaning of the words used in the Act and feels it would be an act of judicial legislation to find that an exception exists as plaintiff claims.

In view of the Court's decision that plaintiff is not entitled to a declaratory judgment as sought because of the construction given to § 20(a) of the Immigration Act of 1924, the causes of action for injunctive relief and money damages fail. Judgment for defendant, settle findings, conclusions and decree.