**Luneta NATION, Plaintiff,**

v.

**P. A. ESPERDY, District Director, Immigration & Naturalization Service, United States Department of Justice, Defendant.**

United States District Court
S. D. New York.
March 19, 1965.

**532**

Edith Lowenstein, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, attorney for defendant; Roy Babitt and James G. Greilsheimer, New York City, of counsel.

FEINBERG, District Judge.

Plaintiff, a naturalized citizen of the United States, seeks a declaratory judgment that defendant District Director of the Immigration & Naturalization Service erred in denying her petition to classify Delroy Anthony Nation ("beneficiary"), her husband's illegitimate son, as a nonquota immigrant. The question is whether, within the meaning of section 101(b)(1)(B) of the Immigration and Nationality Act, 66 Stat. 166 (1952), as amended, 8 U.S.C. § 1101(b)(1)(B) (1958) ("the Act"), a woman who marries a man with an illegitimate child and treats the child as a member of the family thereby acquires a "stepchild." The issue is apparently one of first impression. There being no factual dispute, the government has moved for summary judgment.

The beneficiary was born out of wedlock to Raphael E. Nation, now the plaintiff's husband, and one M———— G————, in Kingston, Jamaica, on February 12, 1947. He was abandoned in infancy by his natural mother. Plaintiff commenced caring for him in 1949 and married the beneficiary's natural father in 1952, when the beneficiary was five years old. Plaintiff immigrated to the United States in 1957; her husband followed a year later. No visa was available for the beneficiary who was left behind in a boarding school. Plaintiff became a naturalized citizen in 1962, and immediately thereafter petitioned for the beneficiary's admittance on a nonquota visa. The beneficiary is now the legally adopted child of plaintiff and her husband as, evidenced by an adoption order issued by the Resident Magistrate's Court, St. Andrew, Jamaica, on July 17, 1963, when the beneficiary was sixteen years old. Concededly, this relationship is without legal significance on this motion.[1]

Section 101(a)(27)(A) of the Act defines the term "nonquota immigrant," *inter alia*, as "an immigrant who is the child * * * of a citizen of the United States." "Child," in turn, is defined in section 101(b)(1) as:

> "(1) * * * an unmarried person under twenty-one years of age who is—
>
> "(A) a legitimate child; or
>
> "(B) a stepchild, whether or not born out of wedlock, provided the child had not

1. But see note 11 infra.

reached the age of eighteen years at the time the marriage creating the status of stepchild occurred; or

\* \* \* \* \* \*

"(D) an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother; \* \* \*."

Soon after plaintiff became a naturalized citizen, she petitioned for a nonquota visa under the above provisions on behalf of the beneficiary whom she characterized as her "stepson." Her petition was denied by the District Director, New York District, and his action was sustained by the Board of Immigration Appeals. Adhering to a previous decision,[2] the Board, in In re Nation, No. A–13844051, p. 3 (April 3, 1964), held that subsection (B):

"does not extend immigration benefits to the illegitimate child of a father who subsequently marries a woman who becomes a citizen of the United States and thereafter seeks to petition for the illegitimate child of her husband as a stepchild."

This action followed, with the plaintiff here contending, as she did below, that the beneficiary became her stepchild in fact and within the meaning of section 101(b)(1)(B) when she married his natural father. It is defendant's contention that Congress intended to classify an illegitimate child as a "stepchild" only if the petitioning citizen spouse is the husband of the child's natural mother. After carefully considering the language of the statute, the relevant legislative history and the events leading up to the enactment of section 101(b)(1)(B), I have concluded that defendant erred in refusing to issue a nonquota immigrant visa to the beneficiary.

Interpreting a complex and interrelated statute is, at best, a perilous undertaking. But it is the business of this court to assume that burden and ascertain congressional intent as best it can. While plaintiff does not urge the "plain meaning" rule in so many words, she does argue that "Congress is presumed to mean what it says,"[3] and that since Congress in 1957 defined stepchild in the broad language of "whether or not born out of wedlock," this definition includes any stepchild whether previously born illegitimately to the mother or the father. The "plain meaning" rule is always deceptively attractive for its simplicity; the trouble is that the meaning of too many statutes is not "plain."[4] For example, although accepted dictionaries define stepchild as a child by a former marriage,[5] this statute literally contemplates that for immigration purposes, a person may be a stepchild even though he is illegitimate. Nonetheless, the language of the statute is of prime importance. Neither the language of section 101(b)(1)(B) nor the accepted dictionary definitions[6] make any distinction between

2. Matter of W., 7 I. & N.Dec. 685 (1958).

3. Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment, p. 7, quoting this language from United States Lines Co. v. Shaughnessy, 101 F.Supp. 61, 64 (S.D.N.Y.1951), aff'd, 195 F.2d 385 (2d Cir. 1952).

4. For cases discussing the "plain meaning" rule, see In re Wong, 224 F.Supp. 155, 157 n. 6 (S.D.N.Y.1963).

5. E. g., Black, Law Dictionary 1584 (4th ed. 1951); Merriam-Webster New International Dictionary 2237 (3d ed. 1961). State cases, usually concerned with rights to insurance or workmen's compensation benefits are about evenly divided on the question whether an illegitimate child is a stepchild of the spouse of his natural parent. Holding that such a child is a stepchild, e. g., Larsen v. Harris Structural Steel Co., 230 App.Div. 280, 243 N.Y.S. pp. 654 (3d Dep't 1930); Hernandez v. Supreme Forest Woodmen Circle, 80 S.W.2d 346 (Tex.Civ.App.1935). Contra, e. g., Dangerfield v. Indemnity Ins. Co., 209 La. 195, 24 So.2d 375 (1945); Sharp v. Borough of Vineland, 117 N.J.L. 598, 190 Atl. 44 (Sup.Ct.), aff'd per curiam, 118 N.J.L. 567, 194 A. 260 (1937).

6. See note 5, supra.

mother and father in defining stepchild. Thus, this may be a proper case, in the witticism of Mr. Justice Frankfurter, "for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." [7] Therefore, the issue whether "stepchild" excludes a father's illegitimate child but not a mother's conceivably might be solved by looking to the statute alone. However, I turn to the legislative history in search, of possible further enlightenment.

Prior to 1957, a child was defined in section 101(b) (1) as:

"an unmarried person under twenty-one years of age who is—

"(A) a legitimate child; or

"(B) a stepchild, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred * * *."

Neither the modifying phrase "whether or not born out of wedlock" now in subsection (B) nor subsection (D) was then a part of the statute.

In 1953, in Matter of M, 5 I. & N.Dec. 120 (1953), a Special Inquiry Officer in New York ruled that an illegitimate child could not be a stepchild and refused to grant a nonquota visa to an illegitimate child whose natural mother was married to a United States citizen, not the child's natural father. The Board of Immigration Appeals disagreed with his conclusion on humanitarian grounds. 5 I. & N.Dec. at 122. The Attorney General reinstated the Officer's decision, ruling that "a child born out of wedlock prior to the marriage of a woman to a United States citizen is not a stepchild within the meaning of section 101(b) (1) (B) * * *." He added: "In view of the doubt that is raised concerning language such as is used in the act * * * this matter should be

specifically called to the attention of Congress for its consideration as to the desirability of clarifying legislation." 5 I. & N.Dec. at 126.

Also significant is Matter of A, 5 I. & N.Dec. 272 (1953). There, a naturalized female citizen sought a nonquota visa for her illegitimate daughter as a "child" of a United States citizen. (Although the petitioner was married to a United States citizen, the Attorney General's previous ruling in Matter of M precluded a serious assertion that the daughter was the citizen husband's stepchild.) The Board, in two scholarly opinions, concluded that "the minor unmarried illegitimate alien child of a citizen mother is eligible for a nonquota status * * *" as a child of a citizen because "Congress did not have in mind the relationship of an illegitimate child to its *mother* when defining child as a legitimate child * *." 5 I. & N. 275, 283. The Attorney General reversed, holding that "because the child in the instant case was neither legitimate nor legitimated, Congress could not have intended her to enjoy nonquota status * * *." He concluded (5 I. & N.Dec. at 284 (1954)):

"If the result here is harsh, the matter should be brought to the attention of Congress and a specific provision sought which would allow such mothers, themselves United States citizens or permanent residents, to bring into their new family units their illegitimate children as nonquota or preferential immigrants."

In 1955, a Special Subcommittee of the Committee on the Judiciary, House of Representatives, in Report on the Administration of the Immigration and Nationality Act, H.R.Rep.No.1570, 84th Cong., 1st Sess. 111 (1955) commented on these decisions as follows:

"A child born out of wedlock was held by the * * * Service to be

---

7. The language comes from Greenwood v. United States, 350 U.S. 366, 374, 76 S. Ct. 410, 415, 100 L.Ed. 412 (1956) and was referred to in both majority (Friend-

ly, J.) and minority (Marshall, J.) opinions in People of State of New York v. Galamison, 342 F.2d 255, 280 (2d Cir. 1965).

ineligible for nonquota status on the basis of a petition filed by the United States citizen stepfather (the legal husband of the mother of such child). While the Board of Immigration Appeals took a contrary view on April 16, 1953, that decision was reversed by the Attorney General on June 2, 1953 (\* \* \* *Matter of M*) \* \* \*.

"On February 2, 1954, the Attorney General ruled *In the Matter of A* \* \* \* that nonquota status was not available to an illegitimate child on the basis of her United States citizen mother's petition, thus again reversing earlier favorable consideration of the Board \* \* \*.

"The inability to bring about a change in the administrative interpretation of the law dealing with 'stepchildren' and 'children' causes the need for an amendment to section 101(b) which will leave no loophole for a strained construction."

It was against this background that, in 1957, the Committee on the Judiciary of the House of Representatives reported favorably on H.R. 8123—an act "to facilitate the entry into the United States of certain adopted children, and other relatives of United States citizens, and for other purposes." It recommended that subsection (B) be amended to include the phrase "whether or not born out of wedlock," and subsection (D) be added to include within the definitions of child "an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother."

It is the government's position that Congress intended the amended subsection (B) and the added subsection (D) to be construed in *pari materia*, so that an illegitimate child can qualify for nonquota status as a citizen's stepchild only if the child's natural mother is the citizen's spouse. Plaintiff, on the other hand, contends that these subsections are independent reactions to the unpopular, fac-

tually distinguishable administrative decisions previously referred to. Moreover, she asserts that the construction urged by the government violates a frequently expressed congressional policy of keeping families together. Although support for both viewpoints can be found in the legislative history, nevertheless, I have concluded that plaintiff's position is correct.

The House Judiciary Committee Report accompanying H.R. 8123, contains an extensive discussion of the child-stepchild problem H.R.Rep.No.1199, 85th Cong., 1st Sess. 7 (1957), U.S.Code Congressional and Administrative News, p. 2016.

"Shortly after the Immigration and Nationality Act became effective \* \* \*, the attention of the committee was called to the administrative interpretation of the term 'child' \* \* \*. The Board of Immigration Appeals \* \* \* [in Matter of M, supra] held that a child born out off wedlock is eligible for nonquota status on the basis of a petition filed by its stepfather, a United States citizen and the legal husband of the mother of such child. However, \* \* \* the Attorney General reversed the decision of the Board and ruled that a child born out of wedlock prior to the marriage of its mother to a United States citizen is not a 'stepchild' within the meaning of section 101(b) (1) (B) \* \* \*. On February 2, 1954, the Attorney General [in Matter of A, supra] rules [*sic*] that an illegitimate child was not eligible for a nonquota status on the basis of a visa petition filed by the United States citizen mother of the child. The committee's request for a reversal of these two decisions met with no success.

"Subsequent decisions of administrative officers operating under the Attorney General follow the line of the interpretation above summarized and actually extend it to apply in the

case of a United States citizen, born out of wedlock, who under section 203(a) (2) of the Immigration and Nationality Act sought to confer second preference status under the quota upon his mother [Matter of F, 7 I. & N.Dec. (1957)].

"In view of the fact that the committee's attempts to clarify legislative intent remain unsuccessful, it is believed that there is need for the enactment of the instant section, in order to alleviate hardship and provide for a fair and humanitarian adjudication of immigration cases involving children born out of wedlock and the mothers of such children.

"The legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united.

"In the report of the Committee on the Judiciary of the Senate (S.Rept. No.1515, 84th Cong., p. 468), the following language appears:

"It was suggested that any new immigration law should provide a better method of keeping families of immigrants together by affording a more liberal treatment of children. It was pointed out that where an American citizen marries an alien widow with children, the wife is entitled to nonquota status but the children must await their turn under a separate preference class.

"In the report accompanying H.R. 5678, 82d Congress, which became the Immigration and Nationality Act (H.Rept.No.1365, 82d Cong., p. 29), it was stated that the bill implements the underlying intentions of our immigration laws regarding the preservation of the family unit. Section 202(a) of the act authorizes various quota charges outside the usual rules for the obvious purpose of avoiding separation of family members so far as possible. In a number of other instances, the statutory language makes it clear that the underlying intent of the legislation was to preserve the family unit upon immigration to the United States.

"*Sympathetic and humane considerations dictate an interpretazion* [sic] *which would not separate the child, whether legitimate, or illegitimate, from its alien parent, particularly in those cases where the citizen parent has executed a petition for the issuance of a nonquota visa to such child and has evidenced an intent to regard the illegitimate stepchild of his spouse as a part of his own family and to raise that child as a part of the family unit. There is ample judicial authority to support a construction which would include the illegitimate child of the spouse as the stepchild of the person who has married the parent of that child.* The case of an immigrant who, upon reaching majority, desires to bring to the United States under the preferential provisions of the law, his mother, to whom he was born out of wedlock, is not different from the case of the stepchild above mentioned. Also, there seems to be no difference in the case of a half-brother or half-sister, born out of wedlock, who desires to confer preferential immigrant status under section 203(a) (4) of the Immigration and Nationality Act. And again there is no difference in the case of a child eligible to benefit from the provisions of section 202(a) (1) of the said act except for the fact that it was born out of wedlock. In view of the clearly expressed legislative intention to keep together the family unit wherever possible, it would appear to be a desirable result, based upon legal and equitable considerations, to adopt a liberal construction. No harm could possibly result from such a construction, and

the consequences would fulfill the humane considerations involved in keeping intact the family unit." (Emphasis added.)

In attempting to find the exact meaning of "stepchild" the effect of this report is confusing. On one hand, the language quoted above in italics emphasizes the policy of not separating a child "from its alien parent" and, in referring to judicial authority, characterizes it in broad language as supporting a "construction which would include the illegitimate child of the spouse as the stepchild of the person who has married the parent of that child." [8] If this "construction" referred only to the illegitimate child of a mother, it would not have been necessary to use the neutral, almost cumbersome, language just quoted. On the other hand, the preceding sentence does refer to "his spouse." Moreover, the three administrative decisions discussed in the report did involve illegitimate children and their mothers. However, two of these decisions dealt with rights a mother and natural child can bestow upon each other, regardless of the mother's marital status. Only one of the decisions (Matter of M) involved the right of an illegitimate child to obtain nonquota entry because of the relationship of his natural parent to a citizen. It is true that in that case the natural parent involved was the mother rather than the father, but on balance, it does not seem justifiable thereby to limit the statutory definition of stepchild to the facts of that case alone.

This interpretation does not render sterile the contemporaneously enacted subsection (D). This provision, as I understand the legislative history, was intended to affirm the Board's conclusion in Matter of A that when Congress restricted the definition of child in section 101(b) (1) (A) to a legitimate child, it was acting in the belief that the immigration authorities would consider a child born out of wedlock to be the legitimate child of his natural mother. Subsection (D), therefore, was not intended as a mere adjunct of the amended subsection (B); rather, it was an affirmation that no one who otherwise qualified as a child under section 101(b) (1) (A) would be precluded from receiving immigration privileges through his natural mother, a United States citizen, because of illegitimate birth (cf. Matter of A, supra); likewise a United States citizen who was born out of wedlock could consider his natural mother as his "parent" for purposes of conferring an immigration preference on her under section 203(a) (2) of the Act, 66 Stat. 178 (1952), as amended, 8 U.S.C. § 1153(a) (2) (1958). (Cf. Matter of F, supra.)

The government's argument that subsection (D) must be a limitation on subsection (B) because of their simultaneous enactment is not convincing in light of the pre-amended version of the statute. If, before 1957, a woman citizen sought nonquota status for her husband's son by a previous *marriage,* there would be no statutory basis for an argument that nonquota status was unavailable because the petitioning female citizen spouse was not the child's natural mother. At that time subsection (D) did not exist and the definition of "child" included "stepchild." I do not doubt that this would have included the legitimate child of the husband by a previous marriage. The situation before me differs only in that the husband's son is not the issue of a prior marriage—he was born out of wedlock, a situation contemplated under subsection (B) and rejected by the 1957 amendment as a basis for denying stepchild status where otherwise proper.

The report of the Senate Committee on the Judiciary favoring passage of that house's version of the 1957 immigration bill is less favorable to plaintiff. In relevant part, the portion of the report entitled "Statement" relating to 101(b)

---

8. There is precedent for ruling that a father's illegitimate child is the stepchild of the father's spouse. Hernandez v. Supreme Forest Woodmen Circle, 80 S.W. 2d 346 (Tex.Civ.App.1935). Contra, Knoxville Gray Eagle Marble Co. v. Meek, 159 Tenn. 577, 21 S.W.2d 625 (1929).

(1) reads (S.Rep.No.1057, 85th Cong., 1st Sess. 4 (1957)):

"Section 1 of the bill, as amended, would amend the definition of the term 'child' as used in titles I and II of the Immigration and Nationality Act, for the purpose of alleviating certain hardships which have arisen as a result of an administrative interpretation that a child born out of wedlock to a woman who subsequently marries a man not the father of the child, is not included within the term 'stepchild.' The proposed amendment would clarify the law in such manner as to make it clear that a child born out of wedlock in relation to its mother may be included in the term "stepchild" and thereby enjoy the same immigration status as other stepchildren. The committee believes that this would accomplish the original intent of the section.

"Section 2 would further redefine the term 'child' * * * to clarify the law so that the illegitimate child would in relation to his mother enjoy the same status under the immigration laws as a legitimate child to remove any doubt of the intent of the original drafters of the act."

The first paragraph quoted above does support the restrictive statutory construction urged by the government. However, the section of the report entitled "Purpose of the Bill" contains the following language (S.Rep.No.1057, supra at 3):

"The purpose of the bill, as amended, is to make certain minor adjustments in the immigration and nationality laws, as follows:

"(1) Clarifies the definition of the term 'stepchild' to make certain that it includes a child born out of wedlock.

"(2) Clarifies the definition of the term 'child' * * * so that the il-

legitimate child would, in relation to his mother, enjoy the same status as a legitimate child. * * *"

The most that can be gleaned from this short statement is that insofar as the first listed purpose is a broad one, it militates against the narrow interpretation urged by the government. On balance, however, it is fair to say that the Senate report more clearly focuses on the mother-child relationship and tends to support defendant's position.

The respective reports, then, are not conclusive, but tend to suggest conflicting interpretations. The debates are hardly more helpful although they do abound with general indications, in line with the House report, that a principal purpose of the 1957 bill was elimination of administrative interpretations that had kept families apart. The following statement by the then Senator Kennedy, who introduced the bill in the Senate, is typical (103 Cong.Rec. 15498 (1957)):[9]

"Most of the provisions of this bill are designed to correct certain situations which have arisen as a result of the workings of statutes already on the books, specifically the Immigration and Nationality Act itself. * * * In each case, these provisions are designed to clarify or adjust existing provisions of law in the interest of reuniting broken families or permitting American citizens to perform eminently humanitarian acts. * * *"

It would be incorrect to characterize the legislative history as compelling but it does indicate that subsection (D) had a limited purpose and does not control the interpretation of subsection (B). Considering that history along with the obviously broad language of subsection (B), I am persuaded that, on the facts of this case, the beneficiary is plaintiff's "stepchild." The government argues that such an interpretation "offers attractive possibilities for fraud" and points out that in this case the beneficiary's sup-

9. See 103 Cong.Rec. 15497, 16300, 16301, 16307, 16308, 16309 (1957); But see 103 Cong. Rec. 15489, 15493 (1957).

posed father is not named in the birth certificate.[10]  Of course, there is no issue as to whether a true natural father-child relationship exists here since defendant does not contest this fact.  Plaintiff, her husband and the beneficiary had concededly been a close family at the outset and immediately after citizenship was secured plaintiff petitioned to reunite the unit.[11]  Whether the expressed congressional policy of keeping family units together should be overruled because of an unexpressed concern about fraud is doubtful, particularly where other sanctions of the law are available.

Accordingly, the government's motion for summary judgment is denied, and plaintiff is granted summary judgment.[12]  So ordered.

10.  Defendant's Memorandum of Law in Support of Motion for Summary Judgment, pp. 12–13.

11.  In fact, plaintiff and her husband legally adopted the beneficiary.  Text accompanying note 1, supra.  Another petition for a nonquota visa under § 101(b)(1) (C) is presently pending before the District Director on the theory that the adoption legitimated the beneficiary under Jamaican law.  The court has been informed that a decision on that petition is being delayed because of problems inherent in ascertaining the relevant foreign law.

12.  Summary judgment for plaintiff seems proper in his case even in absence of a written cross-motion therefor.  Proctor & Gamble Ind. Union v. Proctor & Gamble Mfg. Co., 312 F.2d 181, 190 (2d Cir. 1962);  Local 33, Int'l Hod Carriers v. Mason Tenders, 291 F.2d 496, 505 (2d Cir. 1961);  see Kaplan, Amendments of the Federal Rules of Civil Procedure, 1961–1963 (II), 77 Harv.L.Rev. 801, 828 (1964).