Viola Theresa **ANDRADE**, Plaintiff,

v.

**P. A. ESPERDY**, District Director, Immigration and Naturalization Service, United States Department of Justice, Defendant.

**Civ. No. 66–3393.**

United States District Court
S. D. New York.
July 13, 1967.

---

Benjamin Machinist, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty., S. D. N. Y., by Francis J. Lyons, Special Asst. U. S. Atty., of counsel, for defendant.

EDELSTEIN, District Judge.

## OPINION

This is an action for a declaratory judgment, 28 U.S.C. § 2201, and for a reversal of an administrative ruling under the Administrative Procedure Act, 5 U.S.C. § 1001 et seq. Plaintiff has moved for summary judgment. The material facts in this case are not disputed between the parties and, indeed, an independent review of the record reveals no factual dispute. Hence the matter is appropriate for summary judg-ment. Dressler v. M/V Sandpiper, 331 F.2d 130 (2d Cir. 1964); Rule 56 F.R. Civ.P.

Plaintiff, Viola Theresa Andrade, born in Charleston, South Carolina, on September 7, 1902, is a natural-born citizen of the United States. She married Pedro Vierra Andrade, a naturalized citizen since May 20, 1943, on July 5, 1959, in Bronx County, New York. In 1947, Pedro Andrade, a widower, visited his native Cape Verde Islands. During that time, he briefly lived with a distant relative, an unmarried woman. After Pedro Andrade's return to the United States, she gave birth to their child, Maria de luz Vierra de Andrade, on June 5, 1948. In May 1959, Pedro Andrade went to Portugal and attempted to adopt Maria in order to bring her to the United States. Unfortunately for all concerned, he followed a Portuguese procedure known as "perfilhacao" which is not an adoption but merely an acknowledgment that an illegitimate child is one's own. Mr. Andrade petitioned for a visa on behalf of Maria, which was granted but subsequently revoked when it was discovered that Maria had not been legally adopted. Mrs. Viola Andrade has known Pedro Andrade since prior to 1953 when they began keeping company. He informed her of Maria's existence and of the fact that he sent Maria money, food and clothing. During the Andrades' period of courtship, the future Mrs. Andrade often wrote to Maria. They continued to correspond with each other after the marriage, referring to themselves as "Mother" and "Daughter." Since their marriage the Andrades have been sending Maria fifty dollars a month out of their joint bank account. Mrs. Andrade filed a petition with the Immigration and Naturalization Service to classify Maria as a non-quota immigrant stepchild under Section 101(b) (1) (B) of the Immigration and Nationality Act, 8 U.S.C. § 1101(b) (1) (B), which provides, in part:

> "[A] stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years

at the time the marriage creating the status of stepchild occurred * * *."

The District Director denied the petition on May 12, 1966, on the ground that Maria was not a stepchild within the comtemplation of the statute. This decision was affirmed·by the Board of Immigration Appeals on October 7, 1966.

The Immigration and Naturalization Service takes the position that in order for a child to be a stepchild under the statute there must have existed at one time a bona fide family unit which included the illegitimate child, the natural father and the stepmother. The plaintiff contends that a marriage between a natural father and a woman creates a stepparent-stepchild relationship between the woman and the child and that any consideration of a pre-existing family unit is irrelevant. Both parties purport to be following Judge Feinberg's decision in Nation v. Esperdy, 239 F.Supp. 531 (S.D.N.Y.1965), the only reported court case involving an interpretation of the subsection of the statute presently in question.

In *Nation,* the beneficiary was born out of wedlock to the plaintiff's future husband and another woman in Kingston, Jamaica, on February 12, 1947. The beneficiary was abandoned by his natural mother. The plaintiff began caring for the beneficiary in 1949 and married the beneficiary's natural father in 1952. The plaintiff immigrated to the United States in 1957 and her husband followed a year later. The beneficiary was left behind due to the unavailability of a visa for him. The plaintiff became a naturalized citizen in 1962 and immediately petitioned for the beneficiary's admittance to the United States on a non-quota visa. The petition was denied by the District Director and his action was sustained by the Board of Immigration Appeals. The defendant took the position that an illegitimate child is to be classified as a stepchild only if the petitioning citizen-spouse is the husband of the child's natural mother. Judge Feinberg disagreed and held that the beneficiary was indeed the petitioner's

stepchild and entitled to admittance on a non-quota visa.

The defendant, in the case at hand, does not contend that *Nation* was wrongly decided. Instead, the defendant emphasizes the particular facts of Nation, i. e., the pre-existing family unit. It must be pointed out, however, that in *Nation* the plaintiff left Jamaica in 1957, the husband left in 1958, and the suit was decided in 1965. There had been no family unit for eight years. Neither the plaintiff nor her husband was an American citizen in 1957 so that it was not the case of one desirous of returning to his home. It would seem that family consideration would have called for the family remaining in Jamaica until a visa was available for the child. The language in *Nation* referring to the family unit situation is in reality no more than a broad humanitarian basis for reaching a just decision when no authoritative guidelines existed as to the interpretation of the subsection in question. Indeed, as Judge Feinberg wrote:

> "While plaintiff does not urge the 'plain meaning' rule in so many words, she does argue that 'Congress is presumed to mean what it says,' and that since Congress in 1957 defined stepchild in the broad language of 'whether or not born out of wedlock' this definition includes any stepchild whether previously born illegitimately to the mother or the father. The 'plain meaning' rule is always deceptively attractive for its simplicity; the trouble is that the meaning of too many statutes is not 'plain.' For example, although accepted dictionaries define stepchild as a child by a former marriage, this statute literally contemplates that for immigration purposes, a person may be a stepchild even though he is illegitimate. Nonetheless, the language of the statute is of prime importance. Neither the language of section 101(b) (1) (B) nor the accepted dictionary definitions make any distinction between mother and father in defining the stepchild." Id. at 533–534 (footnotes omitted).

The dictionaries cited by Judge Feinberg were Black, Law Dictionary 1884 (4th ed. 1951) and Merriam-Webster, New International Dictionary 2237 (3rd ed. 1961). The Black definition was cited in Flanagan v. Railroad Retirement Bd., 332 F.2d 301, 303 (3d Cir. 1964), a case involving an interpretation of the Railroad Retirement Act.

Looking at the language of Section 101(b) (1) (B), there seems to be no valid reason why the definition of the word stepchild ought to be burdened with conditions other than those imposed by Congress. Indeed, when Congress wished to change the accepted definition of the word it did so in precise terms by adding the phrase "whether or not born out of wedlock." Prior to 1957 the subsection read:

> "[A] stepchild, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred * * *."

Congress knew how to specify a particular parent in other subsections of 8 U.S. C. § 1101(b) (1):

> "[A] child legitimated under the law of the child's residence or domicile, or under the law of the *father's* residence or domicile * * *." 8 U.S. C. § 1101(b) (1) (C) (emphasis added).

> "[A]n illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural *mother*." 8 U.S.C. § 1101 (b) (1) (D) (emphasis added).

If Congress knew how to specify a particular parent in subsections (C) and (D), there is no reason to assume it did not know how to do so in subsection (B) had it wished.

The legislative history of the subsection in question is quite meager. The Senate Report, on its face, indicates that perhaps a contrary result should have been reached in *Nation:*

> "Section 1 of the Bill, as amended, would amend the definition of the term

'child' as used in Titles I and II of the Immigration and Nationality Act for the purpose of alleviating certain hardships which have arisen as a result of an administrative interpretation that a child born out of wedlock to a woman who subsequently marries a man not the father of the child, is not included within the term 'stepchild.' The proposed amendment would clarify the law in such manner as to make it clear that a child born out of wedlock in relation to its mother may be included in the term 'stepchild' and thereby enjoy the same immigration status as other stepchildren. The committee believes that this would accomplish the original intent of the section." S.Rep.No. 1057, 85th Cong., 1st Sess. 4 (1957).

It seems clear, however, that the Senate used the feminine word "mother" instead of the neuter word "parent" because it was reacting to a particular obnoxious administrative action.

The House, too, was aware of unwarranted administrative action:

> "Shortly after the Immigration and Nationality Act became effective on December 24, 1952, the attention of the committee was called to the administrative interpretation of the term 'child' as defined for the purposes of titles I and II of the act. On April 16, 1953, the Board of Immigration Appeals of the Department of Justice held that a child born out of wedlock is eligible for non-quota status on the basis of a petition filed by its stepfather, a United States citizen and legal husband of the mother of such child. However, on June 2, 1953, the Attorney General reversed the decision of the Board and ruled that a child born out of wedlock prior to the marriage of its mother to a United States citizen is not a 'stepchild' within the meaning of section 101(b) (1) (B), supra. On February 2, 1954, the Attorney General rules [sic] that an illegitimate child was not eligible for a nonquota status on the basis of a visa petition filed by the United States citi-

zen mother of the child. The Committee's request for reversal of these two decisions met with no success.

"Subsequent decisions of administrative officers operating under the Attorney General follow the line of the interpretation above summarized and actually extend it to apply in the case of a United States citizen, born out of wedlock, who under section 203(a) (2) of the Immigration and Nationality Act sought to confer second preference status under the quota upon his mother (decision of April 2, 1957, in the case of VP2–I–22869).

"In view of the fact that the committee's attempts to clarify legislative intent remain unsuccessful, it is believed that there is need for the enactment of the instant section, in order to alleviate hardship and provide for a fair and humanitarian adjudication of immigration cases involving children born out of wedlock and the mothers of such children." H.Rep.No. 1199, 85th Cong., 1st Sess. 7 (1957), U.S. Code Cong. & Admin. News 1957, p. 2020.

In its summary, however, the House used neuter language:

"Sympathetic and humane considerations dictate an interpretztion [sic] which would not separate the child, whether legitimate or illegitimate, from its alien parent, particularly in those cases where the citizen parent has executed a petition for the issuance of a nonquota visa to such child and has evidenced an intent to regard the illegitimate stepchild of his spouse as a part of his own family and to raise that child as a part of the family unit. There is ample judicial authority to support a construction that would include the illegitimate child of the spouse as the stepchild of the person who has married the parent of that child." Id. at 8, U.S.Code Cong. & Admin. News 1957, p. 2021.

Nothing in the legislative history indicates that only the husbands of mothers could petition for children while the wives of fathers could not.

While the House Report speaks of an intention "to preserve the family unit upon immigration to the United States," id. at p. 8, there is nothing to indicate that such intention is the sole purpose of the subsection. The humane considerations of preserving a preexisting family unit and those of creating a unit out of the likeliest of parts, viz. a child, its natural parent and a stepparent when circumstances have kept them apart are indeed in harmony.

■ Although no special circumstances need to be considered for the reversal of the Service's action, this case is nevertheless a more appealing case for such reversal than was *Nation*. In this case, both the father and the petitioner are American citizens. The petitioner is a native born citizen and the father, although naturalized in 1943, entered the United States in 1920. This is not the case of a piecemeal immigration of a family into the United States, not that such immigration is to be condemned. It is the case of two American citizens being thwarted by overzealous administrative action in their attempt to have the husband's child live with them in the later years of their lives. Maria's father was an American citizen and a widower at the time of her birth. He began to attempt to bring Maria to the United States as soon as he was about to provide a "mother" for her by entering into a second marriage. His wife, the petitioner, obviously wants Maria here. The restrictive interpretation given the subsection by the Immigration and Naturalization Service is not only wrong legally, but is unjust. The Service has included in its papers to the court copies of its administrative decisions purporting to follow *Nation*. All that these decisions indicate is that the Service has been consistent—consistently wrong in using the preexisting family unit criterion as the basis for decision.

The court does not see how Maria can be a threat to the security or well-being

of the people of the United States; indeed, the Service has not argued that she is. The erroneous decision of the Board of Immigration Appeals has slammed the door shut on Maria and placed a veil of sorrow on the Andrades in their declining years. Such veil must now be lifted.

Summary judgment is granted for the plaintiff.

So ordered.