FIALLO, A MINOR, BY RODRIGUEZ, ET AL. *v.* BELL, ATTORNEY GENERAL, ET AL.

No. 75–6297.  Argued December 7, 1976—Decided April 26, 1977

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. WHITE, J., filed a dissenting statement, *post*, p. 816. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 800.

*Janet M. Calvo* argued the cause for appellants *pro hac vice.* With her on the briefs were *Kalman Finkel, John E. Kirklin,* and *Anita Fisher Barrett.*

*Harold R. Tyler, Jr.,* argued the cause for appellees. On the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh, Kenneth S. Geller,* and *Sidney M. Glazer.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case brings before us a constitutional challenge to §§ 101 (b)(1)(D) and 101 (b)(2) of the Immigration and Nationality Act of 1952 (Act), 66 Stat. 182, as amended, 8 U. S. C. §§ 1101 (b)(1)(D) and 1101 (b)(2).

## I

The Act grants special preference immigration status to aliens who qualify as the "children" or "parents" of United States citizens or lawful permanent residents. Under § 101 (b)(1), a "child" is defined as an unmarried person under 21 years of age who is a legitimate or legitimated child, a stepchild, an adopted child, or an illegitimate child seeking preference by virtue of his relationship with his natural mother.[1]

---

[1] Section 101 (b)(1), as set forth in 8 U. S. C. § 1101 (b), provides:

"(1) The term 'child' means an unmarried person under twenty-one years of age who is—

"(A) a legitimate child; or

"(B) a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred; or

"(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

"(D) an illegitimate child, by, through whom, or on whose behalf a

The definition does not extend to an illegitimate child seeking preference by virtue of his relationship with his natural father. Moreover, under § 101 (b)(2), a person qualifies as a "parent" for purposes of the Act solely on the basis of the person's relationship with a "child." As a result, the natural father of an illegitimate child who is either a United States citizen or permanent resident alien is not entitled to preferential treatment as a "parent."

The special preference immigration status provided for those who satisfy the statutory "parent-child" relationship depends on whether the immigrant's relative is a United States citizen or permanent resident alien. A United States citizen is allowed the entry of his "parent" or "child" without regard to *either* an applicable numerical quota *or* the labor certification requirement. 8 U. S. C. §§ 1151 (a), (b), 1182 (a)(14). On the other hand, a United States permanent resident alien is allowed the entry of the "parent" or "child" subject to numerical limitations but without regard to the labor certifi-

---

status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother;

"(E) a child adopted while under the age of fourteen years if the child has thereafter been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: *Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter.

"(F) a child, under the age of fourteen at the time a petition is filed in his behalf to accord a classification as an immediate relative under section 1151 (b) of this title [§ 201 (b)], who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care which will be provided the child if admitted to the United States and who has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and his spouse who personally saw and observed the child prior to or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse who have complied with the preadoption requirements, if any, of the child's proposed residence: *Provided,* That no natural parent or prior adoptive parent of any such

cation requirement. 8 U. S. C. § 1182 (a)(14); see 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.40 n. 18 (rev. ed. 1975).[2]

Appellants are three sets of unwed natural fathers and their illegitimate offspring who sought, either as an alien father or an alien child, a special immigration preference by virtue of a relationship to a citizen or resident alien child or parent. In each instance the applicant was informed that he was ineligible for an immigrant visa unless he qualified for admission under the general numerical limitations and, in the case of the alien parents, received the requisite labor certification.[3]

---

child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter."

[2] Effective January 1, 1977, the parent-child relationship no longer triggers an exemption from the labor certification requirement. Immigration and Nationality Act Amendments of 1976, § 5, 90 Stat. 2705. The 1976 amendments contain a saving clause, § 9, however, which provides that the amendments

"shall not operate to affect the entitlement to immigrant status or the order of consideration for issuance of an immigrant visa of an alien entitled to a preference status, under section 203 (a) of the Immigration and Nationality Act, as in effect on the day before the effective date of this Act, on the basis of a petition filed with the Attorney General prior to such effective date."

[3] Appellant Ramon Martin Fiallo, a United States citizen by birth, currently resides in the Dominican Republic with his natural father, appellant Ramon Fiallo-Sone, a citizen of that country. The father initiated procedures to obtain an immigrant visa as the "parent" of his illegitimate son, but the United States Consul for the Dominican Republic informed appellant Fiallo-Sone that he could not qualify for the preferential status accorded to "parents" unless he legitimated Ramon Fiallo.

Appellant Cleophus Warner, a naturalized United States citizen, is the unwed father of appellant Serge Warner, who was born in 1960 in the French West Indies. In 1972 Cleophus Warner petitioned the Immigration and Naturalization Service to classify Serge as Warner's "child" for purposes of obtaining an immigrant visa, but the petition was denied on the ground that there was no evidence that Serge was Warner's legitimate or legitimated offspring.

Appellants Trevor Wilson and Earl Wilson, permanent resident aliens,

Appellants filed this action in July 1974 in the United States District Court for the Eastern District of New York challenging the constitutionality of §§ 101 (b)(1) and 101 (b) (2) of the Act under the First, Fifth, and Ninth Amendments. Appellants alleged that the statutory provisions (i) denied them equal protection by discriminating against natural fathers and their illegitimate children "on the basis of the father's marital status, the illegitimacy of the child and the sex of the parent without either compelling or rational justification"; (ii) denied them due process of law to the extent that there was established "an unwarranted conclusive presumption of the absence of strong psychological and economic ties between natural fathers and their children born out of wedlock and not legitimated"; and (iii) "seriously burden[ed] and infringe[d] upon the rights of natural fathers and their children, born out of wedlock and not legitimated, to mutual association, to privacy, to establish a home, to raise natural children and to be raised by the natural father." App. 11–12. Appellants sought to enjoin permanently enforcement of the challenged statutory provisions to the extent that the statute precluded them from qualifying for the special preference accorded other "parents" and "children."

A three-judge District Court was convened to consider the constitutional issues. After noting that Congress' power to fashion rules for the admission of aliens was "exceptionally broad," the District Court held, with one judge dissenting, that the statutory provisions at issue were neither "wholly devoid of any conceivable rational purpose" nor "fundamentally aimed at achieving a goal unrelated to the regulation of immigration." *Fiallo* v. *Levi*, 406 F. Supp. 162, 165, 166

are the illegitimate children of appellant Arthur Wilson, a citizen of Jamaica. Following the death of their mother in 1974, Trevor and Earl sought to obtain an immigrant visa for their father. We are informed by the appellees that although the application has not yet been rejected, denial is certain since the children are neither legitimate nor legitimated offspring of Arthur Wilson.

(1975). The court therefore granted judgment for the Government and dismissed the action.

We noted probable jurisdiction *sub nom. Fiallo* v. *Levi,* 426 U. S. 919 (1976), and for the reasons set forth below we affirm.

## II

At the outset, it is important to underscore the limited scope of judicial inquiry into immigration legislation. This Court has repeatedly emphasized that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Oceanic Navigation Co.* v. *Stranahan,* 214 U. S. 320, 339 (1909); accord, *Kleindienst* v. *Mandel,* 408 U. S. 753, 766 (1972). Our cases "have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy* v. *Mezei,* 345 U. S. 206, 210 (1953); see, *e. g., Harisiades* v. *Shaughnessy,* 342 U. S. 580 (1952); *Lem Moon Sing* v. *United States,* 158 U. S. 538 (1895); *Fong Yue Ting* v. *United States,* 149 U. S. 698 (1893); *The Chinese Exclusion Case,* 130 U. S. 581 (1889). Our recent decisions have not departed from this long-established rule. Just last Term, for example, the Court had occasion to note that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 101 n. 21 (1976), citing *Fong Yue Ting* v. *United States, supra,* at 713; accord, *Mathews* v. *Diaz,* 426 U. S. 67, 81–82 (1976). And we observed recently that in the exercise of its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.,* at 80.[4]

---

[4] Writing for the Court in *Galvan* v. *Press,* 347 U. S. 522 (1954), Mr. Justice Frankfurter noted that "much could be said for the view" that due process places some limitations on congressional power in the immigration area, "were we writing on a clean slate."

"But the slate is not clean. As to the extent of the power of Congress

Appellants apparently do not challenge the need for special judicial deference to congressional policy choices in the immigration context,[5] but instead suggest that a "unique coalescing of factors" makes the instant case sufficiently unlike prior immigration cases to warrant more searching judicial scrutiny. Brief for Appellants 52–55. Appellants first observe that since the statutory provisions were designed to reunite families wherever possible, the purpose of the statute was to afford rights not to aliens but to United States citizens and legal permanent residents. Appellants then rely on our border-search decisions in *Almeida-Sanchez v. United States,* 413 U. S. 266 (1973), and *United States v. Brignoni-Ponce,* 422 U. S. 873 (1975), for the proposition that the courts must

under review, there is not merely 'a page of history' . . . but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. . . . But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government. . . .

"We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens . . . ." *Id.,* at 530–532.

We are no more inclined to reconsider this line of cases today than we were five years ago when we decided *Kleindienst v. Mandel,* 408 U. S. 753, 767 (1972).

[5] The appellees argue that the challenged sections of the Act, embodying as they do "a substantive policy regulating the admission of aliens into the United States, [are] not an appropriate subject for judicial review." Brief for Appellees 15, 19–24. Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens, and there is no occasion to consider in this case whether there may be actions of the Congress with respect to aliens that are so essentially political in character as to be nonjusticiable.

scrutinize congressional legislation in the immigration area to protect against violations of the rights of citizens. At issue in the border-search cases, however, was the nature of the protections mandated by the Fourth Amendment with respect to Government procedures designed to stem the illegal entry of aliens. Nothing in the opinions in those cases suggests that Congress has anything but exceptionally broad power to determine which classes of aliens may lawfully enter the country. See 413 U. S., at 272; 422 U. S., at 883–884.

Appellants suggest a second distinguishing factor. They argue that none of the prior immigration cases of this Court involved "double-barreled" discrimination based on sex and illegitimacy, infringed upon the due process rights of citizens and legal permanent residents, or implicated "the fundamental constitutional interests of United States citizens and permanent residents in a familial relationship." Brief for Appellants 53–54; see *id.,* at 16–18. But this Court has resolved similar challenges to immigration legislation based on other constitutional rights of citizens, and has rejected the suggestion that more searching judicial scrutiny is required. In *Kleindienst* v. *Mandel, supra,* for example, United States citizens challenged the power of the Attorney General to deny a visa to an alien who, as a proponent of "the economic, international, and governmental doctrines of World communism," was ineligible to receive a visa under 8 U. S. C. § 1182 (a)(28)(D) absent a waiver by the Attorney General. The citizen-appellees in that case conceded that Congress could prohibit entry of all aliens falling into the class defined by § 1182 (a)(28)(D). They contended, however, that the Attorney General's statutory discretion to approve a waiver was limited by the Constitution and that their First Amendment rights were abridged by the denial of Mandel's request for a visa. The Court held that "when the Executive exercises this ·[delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind

the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." 408 U. S., at 770. We can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst* v. *Mandel,* a First Amendment case.[6]

---

[6] The thoughtful dissenting opinion of our Brother MARSHALL would be persuasive if its basic premise were accepted. The dissent is grounded on the assumption that the relevant portions of the Act grant a "fundamental right" to American citizens, a right "given only to the citizen" and not to the putative immigrant. *Post,* at 806, 808, 816. The assumption is facially plausible in that the families of putative immigrants certainly have an interest in their admission. But the fallacy of the assumption is rooted deeply in fundamental principles of sovereignty.

We are dealing here with an exercise of the Nation's sovereign power to admit or exclude foreigners in accordance with perceived national interests. Although few, if any, countries have been as generous as the United States in extending the privilege to immigrate, or in providing sanctuary to the oppressed, limits and classifications as to who shall be admitted are traditional and necessary elements of legislation in this area. It is true that the legislative history of the provision at issue here establishes that congressional concern was directed at "the problem of keeping families of United States citizens and immigrants united." H. R. Rep. No. 1199, 85th Cong., 1st Sess., 7 (1957). See also H. R. Rep. No. 1365, 82d Cong., 2d Sess., 29 (1952) (statute implements "the underlying intention of our immigration laws regarding the preservation of the family unit"). To accommodate this goal, Congress has accorded a special "preference status" to certain aliens who share relationships with citizens or permanent resident aliens. But there are widely varying relationships and degrees of kinship, and it is appropriate for Congress to consider not only the nature of these relationships but also problems of identification, administration, and the potential for fraud. In the inevitable process of "line drawing," Congress has determined that certain classes of aliens are more likely than others to satisfy national objectives without undue cost, and it has granted preferential status only to those classes.

As Mr. Justice Frankfurter wrote years ago, the formulation of these "[p]olicies pertaining to the entry of aliens . . . is entrusted exclusively to Congress." *Galvan* v. *Press,* 347 U. S., at 531. This is not to say, as

Finally, appellants characterize our prior immigration cases as involving foreign policy matters and congressional choices to exclude or expel groups of aliens that were "specifically and clearly perceived to pose a grave threat to the national security," citing *Harisiades* v. *Shaughnessy,* 342 U. S. 580 (1952), "or to the general welfare of this country," citing *Boutilier* v. *INS,* 387 U. S. 118 (1967). Brief for Appellants 54. We find no indication in our prior cases that the scope of judicial review is a function of the nature of the policy choice at issue. To the contrary, "[s]ince decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary," and "[t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Mathews* v. *Diaz,* 426 U. S., at 81–82. See *Harisiades* v. *Shaughnessy, supra,* at 588–589. As Mr. Justice Frankfurter observed in his concurrence in *Harisiades* v. *Shaughnessy:*

> "The conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control." 342 U. S., at 596–597.

---

we make clear in n. 5, *supra,* that the Government's power in this area is never subject to judicial review. But our cases do make clear that despite the impact of these classifications on the interests of those already within our borders, congressional determinations such as this one are subject only to limited judicial review.

## III

As originally enacted in 1952, § 101 (b)(1) of the Act defined a "child" as an unmarried legitimate or legitimated child or stepchild under 21 years of age. The Board of Immigration Appeals and the Attorney General subsequently concluded that the failure of this definition to refer to illegitimate children rendered ineligible for preferential nonquota status both the illegitimate alien child of a citizen mother, *Matter of A,* 5 I. & N. Dec. 272, 283–284 (A. G. 1953), and the alien mother of a citizen born out of wedlock, *Matter of F,* 7 I. & N. Dec. 448 (B. I. A. 1957). The Attorney General recommended that the matter be brought to the attention of Congress, *Matter of A, supra,* at 284, and the Act was amended in 1957 to include what is now 8 U. S. C. § 1101 (b)(1)(D). See n. 1, *supra.* Congress was specifically concerned with the relationship between a child born out of wedlock and his or her natural mother, and the legislative history of the 1957 amendment reflects an intentional choice not to provide preferential immigration status by virtue of the relationship between an illegitimate child and his or her natural father.[7]

This distinction is just one of many drawn by Congress pursuant to its determination to provide some—but not all—families with relief from various immigration restrictions that would otherwise hinder reunification of the family in this country. In addition to the distinction at issue here, Con-

---

[7] S. Rep. No. 1057, 85th Cong., 1st Sess., 4 (1957) (the amendment was designed "to clarify the law so that the illegitimate child would *in relation to his mother* enjoy the same status under the immigration laws as a legitimate child") (emphasis added); H. R. Rep. No. 1199, 85th Cong., 1st Sess., 7 (1957) (the amendment was designed "to alleviate hardship and provide for a fair and humanitarian adjudication of immigration cases involving children born out of wedlock and *the mothers of such children*") (emphasis added); 103 Cong. Rec. 14659 (1957) (remarks of Sen. Kennedy) (the amendment "would clarify the law so that an illegitimate child would, *in relation to his mother,* enjoy the same status under immigration laws as a legitimate child") (emphasis added).

gress has decided that children, whether legitimate or not, cannot qualify for preferential status if they are married or are over 21 years of age. 8 U. S. C. § 1101 (b)(1). Legitimated children are ineligible for preferential status unless their legitimation occurred prior to their 18th birthday and at a time when they were in the legal custody of the legitimating parent or parents. § 1101 (b)(1)(C). Adopted children are not entitled to preferential status unless they were adopted before the age of 14 and have thereafter lived in the custody of their adopting or adopted parents for at least two years, § 1101 (b)(1)(E). And stepchildren cannot qualify unless they were under 18 at the time of the marriage creating the stepchild relationship. § 1101 (b)(1)(B).

With respect to each of these legislative policy distinctions, it could be argued that the line should have been drawn at a different point and that the statutory definitions deny preferential status to parents and children who share strong family ties. Cf. *Mathews* v. *Diaz, supra,* at 83–84. But it is clear from our cases, see Part II, *supra,* that these are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress.

Appellants suggest that the distinction drawn in § 101 (b) (1)(D) is unconstitutional under any standard of review since it infringes upon the constitutional rights of citizens and legal permanent residents without furthering legitimate governmental interests. Appellants note in this regard that the statute makes it more difficult for illegitimate children and their natural fathers to be reunited in this country than for legitimate or legitimated children and their parents, or for illegitimate children and their natural mothers. And appellants also note that the statute fails to establish a procedure under which illegitimate children and their natural fathers could prove the existence and strength of their family relationship. Those are admittedly the consequences of the

congressional decision not to accord preferential status to this particular class of aliens, but the decision nonetheless remains one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Harisiades* v. *Shaughnessy,* 342 U. S., at 597 (Frankfurter, J., concurring). Congress obviously has determined that preferential status is not warranted for illegitimate children and their natural fathers, perhaps because of a perceived absence in most cases of close family ties as well as a concern with the serious problems of proof that usually lurk in paternity determinations.[8] See *Trimble* v. *Gordon, ante,* at 771. In any event, it is not the judicial role in cases of this sort to probe and test the justifications for the legislative decision.[9] *Kleindienst* v. *Mandel,* 408 U. S., at 770.

## IV

We hold that §§ 101 (b)(1)(D) and 101 (b)(2) of the

---

[8] The inherent difficulty of determining the paternity of an illegitimate child is compounded when it depends upon events that may have occurred in foreign countries many years earlier. Congress may well have given substantial weight, in adopting the classification here challenged, to these problems of proof and the potential for fraudulent visa applications that would have resulted from a more generous drawing of the line. Moreover, our cases clearly indicate that legislative distinctions in the immigration area need not be as " 'carefully tuned to alternative considerations,' " *Trimble* v. *Gordon, ante,* at 772 (quoting *Mathews* v. *Lucas,* 427 U. S. 495, 513 (1976)), as those in the domestic area.

[9] Appellants insist that the statutory distinction is based on an overbroad and outdated stereotype concerning the relationship of unwed fathers and their illegitimate children, and that existing administrative procedures, which had been developed to deal with the problems of proving paternity, maternity, and legitimation with respect to statutorily recognized "parents" and "children," could easily handle the problems of proof involved in determining the paternity of an illegitimate child. We simply note that this argument should be addressed to the Congress rather than the courts. Indeed, in that regard it is worth noting that a bill introduced in the 94th Congress would have eliminated the challenged distinction. H. R. 10993, 94th Cong., 1st Sess. (1975).

Immigration and Nationality Act of 1952 are not unconstitutional by virtue of the exclusion of the relationship between an illegitimate child and his natural father from the preferences accorded by the Act to the "child" or "parent" of a United States citizen or lawful permanent resident.

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Until today I thought it clear that when Congress grants benefits to some citizens, but not to others, it is our duty to insure that the decision comports with Fifth Amendment principles of due process and equal protection. Today, however, the Court appears to hold that discrimination among citizens, however invidious and irrational, must be tolerated if it occurs in the context of the immigration laws. Since I cannot agree that Congress has license to deny fundamental rights to citizens according to the most disfavored criteria simply because the Immigration and Nationality Act is involved, I dissent.

## I

The Immigration and Nationality Act of 1952 (INA), 8 U. S. C. § 1101 *et seq.,* establishes the terms and conditions for entry into the United States. Among its various conditions, the Act requires that an alien seeking to enter the United States as a legal permanent resident must come within a restrictive numerical quota and must satisfy certain labor certification requirements. INA §§ 201, 202, 212 (a)(14), 8 U. S. C. §§ 1151, 1152, 1182 (a)(14) (1976 ed.), as amended by the Immigration and Nationality Act Amendments of 1976, 90 Stat. 2703 (hereinafter 1976 Amendments). In recognition of the fact that such requirements frequently separate families, Congress has provided that American citizens may petition

to have the requirements waived for their immediate families—spouse, parents, children. INA §§ 201 (a), (b), 212 (a)(14), 8 U. S. C. §§ 1151 (a), (b), 1182 (a)(14).[1]

[1] Title 8 U. S. C. §§ 1151 (a) and (b) provide:

"§ 1151. Numerical limitations on total lawful admissions.

"(a) Quarterly and yearly limitations.

"Exclusive of special immigrants defined in section 1101 (a) (27) of this title, and of the immediate relatives of United States citizens specified in subsection (b) of this section, the number of aliens who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence, or who may, pursuant to section 1153 (a)(7) of this title enter conditionally, (i) shall not in any of the first three quarters of any fiscal year exceed a total of 45,000 and (ii) shall not in any fiscal year exceed a total of 170,000.

"(b) Immediate relatives defined.

"*The 'immediate relatives' referred to in subsection (a) of this section shall mean the children, spouses, and parents of a citizen of the United States: Provided, That in the case of parents, such citizen must be at least twenty-one years of age.* The immediate relatives specified in this subsection who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations in this chapter." (Emphasis added.)

The changes made by the 1976 Amendments were not material to this case.

Title 8 U. S. C. § 1182 (a)(14) provides:

"§ 1182. Excludable aliens.

"(a) General classes.

"Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

"(14) Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the

The privilege is accorded only to those parents and children who satisfy the statute's definitions. Under INA § 101 (b) (1), a "child" is defined as an unmarried person under 21 years of age who is a legitimate or legitimated child, a stepchild, an adopted child, or an illegitimate child by whom or on whose behalf a privilege is sought by virtue of the relationship of the child to its biological mother. 8 U. S. C. § 1101 (b)(1).[2] A "parent" is defined under INA § 101 (b)(2) solely

employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply to special immigrants defined in section 1101 (a) (27) (A) of this title (*other than the parents, spouses, or children of United States citizens or of aliens lawfully admitted to the United States for permanent residence*), to preference immigrant aliens described in sections 1153 (a) (3) and 1153 (a) (6) of this title, and to nonpreference immigrant aliens described in section 1153 (a) (8) of this title." (Emphasis added.)

For the significance of the 1976 Amendments on this section, see n. 4, *infra*.

[2] Title 8 U. S. C. § 1101 (b) (1) provides:

"(1) The term *'child'* means an unmarried person under twenty-one years of age who is—

"(A) a legitimate child; or

"(B) a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred; or

"(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

"(D) an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother;

"(E) a child adopted while under the age of fourteen years if the child has thereafter been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: *Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of

on the basis of the individual's relationship with a "child" as defined by § 101 (b)(1). 8 U. S. C. § 1101 (b)(2).[3] The definitions cover virtually all parent-child relationships except that of biological father-illegitimate child. Thus while all American citizens are entitled to bring in their alien children without regard to either the numerical quota or the labor certification requirement, fathers are denied this privilege with respect to their illegitimate children. Similarly, all citizens are allowed to have their parents enter without regard to the labor certification requirement, and, if the citizen is over 21, also without regard to the quota. Illegitimate children, however, are denied such preferences for their fathers.

The unfortunate consequences of these omissions are graphically illustrated by the case of appellant Cleophus Warner.[4]

---

such parentage, be accorded any right, privilege, or status under this chapter.

"(F) a child, under the age of fourteen at the time a petition is filed in his behalf to accord a classification as an immediate relative under section 1151 (b) of this title, who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care which will be provided the child if admitted to the United States and who has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and his spouse who personally saw and observed the child prior to or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse who have complied with the preadoption requirements, if any, of the child's proposed residence: *Provided*, That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter."

[3] Title 8 U. S. C. § 1101 (b)(2) provides:

"The terms 'parent,' 'father,' or 'mother' mean a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection."

[4] Instituting this suit with Warner were Ramon Fiallo, and Trevor and Earl Wilson. Both Fiallo, a five-year-old American citizen, and the Wilsons, teen-aged permanent resident aliens, sought the waiver of the labor

Mr. Warner is a naturalized citizen of the United States who, pursuant to 8 U. S. C. § 1154,[5] petitioned the Attorney General for an immigrant visa for his illegitimate son Serge, a citizen of the French West Indies. Despite the fact that Mr. Warner acknowledged his paternity and registered as Serge's father shortly after his birth, has his name on Serge's birth certificate, and has supported and maintained Serge since birth, the special dispensation from the quota and labor certification requirements was denied because Serge was not a "child" under the statute. It matters not that, as the Government concedes, Tr. of Oral Arg. 25–26, Serge's mother has abandoned Serge to his father and has, by marrying another man, apparently rendered impossible, under French West Indies law, Mr. Warner's ever legitimating Serge. Mr. Warner is simply not Serge's "parent."

## II

The Government contends that this legislation is not subject to judicial review. Pointing to the fact that aliens have no constitutional right to immigrate to the United States and to a long line of cases that recognize that policies pertaining to

---

certification requirements for their respective fathers. Although the 1976 Amendments removed the exemptions from the labor certification requirement for the parent-child relationship, nevertheless their cases are not moot. There is a saving clause providing: "The amendments made by this Act shall not operate to affect the entitlement to immigrant status or the order of consideration for issuance of an immigrant visa of an alien entitled to a preference status, under section 203 (a) of the Immigration and Nationality Act, as in effect on the day before the effective date of this Act, on the basis of a petition filed with the Attorney General prior to such effective date." 1976 Amendments § 9.

Since these situations cannot recur, however, I will focus on Mr. Warner, whose plight, unfortunately, can be repeated.

[5] The citizen seeking "immediate relative" status for his or her spouse, parent, or child must file a so-called Form I–130 petition with the Attorney General. See text accompanying n. 7, *infra*, for a description of the procedure.

the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government, the Government concludes that "[t]he congressional decision whether or to whom to extend such a valuable privilege . . . is not a subject of judicial concern." Brief for Appellees 22.

The Court rightly rejects this expansive claim and recognizes that "[o]ur cases reflect acceptance of a limited judicial responsibility . . . even with respect to the power of Congress to regulate the admission and exclusion of aliens." *Ante,* at 793 n. 5. It points out, however, that the scrutiny is circumscribed. Congress has "broad power to determine which classes of aliens may lawfully enter the country" and its political judgments warrant deference. *Ante,* at 794–796.

I wholeheartedly agree with the Court's rejection of the Government's claim of unreviewable discretion. Indeed, as I observed in *Kleindienst* v. *Mandel,* 408 U. S. 753, 781 (1972) (dissenting opinion), the old immigration cases that reflect an absolute "hands-off" approach by this Court "are not the strongest precedents in the United States Reports." I am pleased to see the Court reveal once again a "reluctance to rely on them completely." *Ibid.* I also have no quarrel with the principle that the essentially political judgments by Congress as to which foreigners may enter and which may not deserve deference from the judiciary.

My disagreement with the Court arises from its application of the principle in this case. The review the majority purports to require turns out to be completely "toothless." Cf. *Trimble* v. *Gordon, ante,* at 767. After observing the effects of the denial of preferential status to appellants, the majority concludes: "[B]ut the decision nonetheless remains one 'solely for the responsibility of the Congress and wholly outside the power of this Court to control.'" *Ante,* at 799. Such "review" reflects more than due deference; it is abdication.[6]

---

[6] The majority does not even engage in the modest degree of scrutiny required by *Kleindienst* v. *Mandel,* 408 U. S. 753 (1972). See discussion

Assuming, *arguendo*, that such deference might be appropriate in some situations—a supposition I find difficult to accept—it is particularly inappropriate in this case.

This case, unlike most immigration cases that come before the Court, directly involves the rights of citizens, not aliens. "[C]oncerned with the problem of keeping families of United States citizens and immigrants united," H. R. Rep. No. 1199, 85th Cong., 1st Sess., 7 (1957), Congress extended to American citizens the right to choose to be reunited in the United States with their immediate families. The focus was on citizens and their need for relief from the hardships occasioned by the immigration laws. The right to seek such relief was given only to the citizen, not the alien. 8 U. S. C. § 1154.[7] If the citizen does not petition the Attorney General for the special "immediate relative" status for his parent or child, the alien,

---

*infra*, at 807–808. That failure, I submit, is due to the fact that the statute could not even pass that standard of review. See Part III, *infra*.

[7] Under 8 U. S. C. § 1154 (a), "[a]ny citizen of the United States claiming that an alien is entitled to . . . an immediate relative status under section 1151 (b) of this title . . . *may* file a petition with the Attorney General for such classification." (Emphasis added.) Title 8 U. S. C. § 1154 (b) prescribes the procedure after a petition is filed:

"(b) Investigation; consultation; approval; authorization to grant preference status

"After an investigation of the facts in each case, and after consultation with the Secretary of Labor with respect to petitions to accord a status under section 1153 (a) (3) or 1153 (a) (6) of this title, the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151 (b) of this title, or is eligible for a preference status under section 1153 (a) of this title, approve the petition and forward one copy thereof to the Department of State. The Secretary of State shall then authorize the consular officer concerned to grant the preference status."

Title 8 U. S. C. § 1153 (d) precludes a consular officer from granting preferential status as an "immediate relative" "until he has been authorized to do so as provided by section 1154."

despite his relationship, can receive no preference. 8 U. S. C. § 1153 (d). It is irrelevant that aliens have no constitutional right to immigrate and that Americans have no constitutional right to compel the admission of their families. The essential fact here is that Congress did choose to extend such privileges to American citizens but then denied them to a small class of citizens. When Congress draws such lines among citizens, the Constitution requires that the decision comport with Fifth Amendment principles of equal protection and due process. The simple fact that the discrimination is set in immigration legislation cannot insulate from scrutiny the invidious abridgment of citizens' fundamental interests.

The majority responds that in *Kleindienst* v. *Mandel, supra,* the Court recognized that First Amendment rights of citizens were "implicated," but refused to engage in the close scrutiny usually required in First Amendment cases. Therefore, it argues, no more exacting standard is required here. In that case, Mandel, a Belgian "revolutionary Marxist," could visit this country only if the Attorney General waived the statutory prohibition of visas to "[a]liens who advocate the economic, international, and governmental doctrines of World communism." 8 U. S. C. § 1182 (a) (28) (D). The Attorney General denied the waiver, and suit was brought by Mandel and several citizens who claimed their First Amendment right to hear Mandel in person was abridged by the denial. Rejecting the Government's contention that it had "unfettered discretion, and any reason or no reason [for denying a waiver] may be given," the Court upheld the denial only after finding that it was based on a "legitimate and bona fide" reason—Mandel's abuses of visa privileges on a prior visit. 408 U. S., at 769. At the same time, however, the Court chose not to scrutinize more closely and accepted the reason without weighing against it the claimed First Amendment interest. It feared becoming embroiled in the "dangerous and undesirable" task of con-

sidering, every time an alien was denied a waiver, such factors as the projected number of people wishing to speak with the alien and the probity of his ideas. *Id.*, at 769.

Whatever the merits of the Court's fears in *Mandel*, cf. *id.*, at 774 (MARSHALL, J., dissenting), the present case is clearly distinguishable in two essential respects. First, in *Mandel*, Congress had not focused on citizens and their need for relief. Rather, the governmental action was concerned with keeping out "undesirables." The impact on the citizens' right to hear was an incidental and unavoidable consequence of that political judgment. The present case presents a qualitatively different situation. Here, the purpose of the legislation is to accord rights, not to aliens, but to United States citizens. In so doing, Congress deliberately chose, for reasons unrelated to foreign policy concerns or threats to national security, to deny those rights to a class of citizens traditionally subject to discrimination.[8] Second, in *Mandel*, unlike the present case, appellees conceded the ability of Congress to enact legislation broadly prohibiting the entry of all aliens with Mandel's beliefs.[9] Their concern was directed instead to the exercise of the discretion granted the Attorney General to waive the prohibition. In the present case, by contrast, we are asked to engage in the traditional task of reviewing the valid-

---

[8] Indeed, the majority concedes, *ante,* at 795 n. 6, that if it is true that Congress has granted a right to citizens and not to aliens, my position is "persuasive." It then attempts to show that the premise is inaccurate. The effort, however, is doomed. There is no way to avoid the facts that, as the majority agrees, Congress was concerned with the problem of separating United States citizens from their families and that, as the majority ignores, it specifically gave to citizens the right to seek special dispensation from the immigration restrictions for their immediate families. See discussion *supra,* at 806–807.

[9] The Court noted: "[Appellees] concede that Congress could enact a blanket prohibition against entry of all aliens falling into the class defined by §§ 212 (a)(28)(D) and (G)(v), and that First Amendment rights could not override that decision." 408 U. S., at 767. But see *id.*, at 779 n. 4 (MARSHALL, J., dissenting).

ity of a general Act of Congress challenged as unconstitutional on its face. Totally absent therefore is the specter of involving the courts in second-guessing countless individual determinations by the Attorney General as to the merits of a particular alien's entrance.

## III

### A

Once it is established that this discrimination among citizens cannot escape traditional constitutional scrutiny simply because it occurs in the context of immigration legislation, the result is virtually foreordained. One can hardly imagine a more vulnerable statute.

The class of citizens denied the special privilege of reunification in this country is defined on the basis of two traditionally disfavored classifications—gender and legitimacy. Fathers cannot obtain preferred status for their illegitimate children; mothers can. Conversely, every child except the illegitimate—legitimate, legitimated, step-, adopted—can obtain preferred status for his or her alien father. The Court has little tolerance for either form of discrimination. We require that gender-based classifications "serve important governmental objectives and . . . be substantially related to achievement of those objectives." *Califano* v. *Webster, ante,* at 317; *Califano* v. *Goldfarb, ante,* at 210–211; *Craig* v. *Boren,* 429 U. S. 190, 197 (1976); see also *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); *Stanton* v. *Stanton,* 421 U. S. 7 (1975); *Taylor* v. *Louisiana,* 419 U. S. 522 (1975); *Frontiero* v. *Richardson,* 411 U. S. 677 (1973); *Reed* v. *Reed,* 404 U. S. 71 (1971). We are similarly hostile to legislation excluding illegitimates from governmental beneficence, finding it "illogical and unjust" to deprive a child "simply because its natural father has not married its mother." *Gomez* v. *Perez,* 409 U. S. 535, 538 (1973). See also *Trimble* v. *Gordon, ante,* p. 762; *Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *Beaty* v. *Weinberger,* 478 F. 2d 300 (CA5 1973), summarily aff'd, 418 U. S. 901 (1974);

*New Jersey Welfare Rights Org.* v. *Cahill,* 411 U. S. 619 (1973); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Davis* v. *Richardson,* 342 F. Supp. 588 (Conn., 1972), summarily aff'd, 409 U. S. 1069 (1972); *Griffin* v. *Richardson,* 346 F. Supp. 1226 (Md.), summarily aff'd, 409 U. S. 1069 (1972); *Glona* v. *American Guarantee & Liability Ins. Co.,* 391 U. S. 73 (1968); *Levy* v. *Louisiana,* 391 U. S. 68 (1968); cf. *Mathews* v. *Lucas,* 427 U. S. 495 (1976). But see *Labine* v. *Vincent,* 401 U. S. 532 (1971).

But it is not simply the invidious classifications that make the statute so vulnerable to constitutional attack. In addition the statute interferes with the fundamental "freedom of personal choice in matters of marriage and family life." *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632, 639–640 (1974); see also *Roe* v. *Wade,* 410 U. S. 133, 152–153 (1973); *Wisconsin* v. *Yoder,* 406 U. S. 205, 231–233 (1972); *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972); *Ginsberg* v. *New York,* 390 U. S. 629, 639 (1968); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *id.,* at 495–496 (Goldberg, J., concurring); *id.,* at 502–503 (WHITE, J., concurring); *Poe* v. *Ullman,* 367 U. S. 497, 542–544, 549–553 (Harlan, J., dissenting). The right to live together as a family belongs to both the child who seeks to bring in his or her father and the father who seeks the entrance of his child.

> "It is no less important for a child to be cared for by its . . . parent when that parent is male rather than female. And a father, no less than a mother, has a constitutionally protected right to the 'companionship, care, custody, and management' of 'the children he has sired and raised . . .' *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972)." *Weinberger* v. *Wiesenfeld, supra,* at 652.

In view of the legislation's denial of this right to these classes, it is clear that, whatever the verbal formula, the Government bears a substantial burden to justify the statute.

## B

There is no dispute that the purpose of these special preference provisions is to reunify families separated by the immigration laws. As Congress itself declared "[t]he legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended [in these provisions] to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." H. R. Rep. No. 1199, 85th Cong., 1st Sess., 7 (1957). It is also clear that when Congress extended the privilege to cover the illegitimate-child-mother relationship in 1957, it did so to alleviate hardships it found in several cases denying preferential status to illegitimate children and their mothers. *Id.*, at 7–8. Accord, S. Rep. No. 1057, 85th Cong., 1st Sess., 4 (1957).

The legislative history, however, gives no indication of why these privileges were absolutely denied illegitimate children and their fathers.[10] The Government suggests that Congress may have believed that "such persons are unlikely to have maintained a close personal relationship with their offspring." Brief for Appellees 17. If so, Congress' chosen shorthand for "closeness" is obviously overinclusive. No one can dispute that there are legitimate, legitimated, step-, and adoptive parent-child relationships and mother-illegitimate child relationships that are not close and yet are accorded the preferential status. Indeed, the most dramatic illustration of the overinclusiveness is the fact that while Mr. Warner can never be deemed a "parent" of Serge, nevertheless, if he should marry, his wife could qualify as a stepparent, entitled to obtain for Serge the preferential status that Mr. Warner cannot

---

[10] This absence should alert us to the danger, ever present in legislation denying rights along gender and legitimacy lines, that it was very likely "habit, rather than analysis or actual reflection," *Califano* v. *Goldfarb, ante,* at 222 (STEVENS, J., concurring), that led Congress to assume that only mothers are close to their illegitimate children.

obtain. *Andrade* v. *Esperdy,* 270 F. Supp. 516 (SDNY 1967); *Nation* v. *Esperdy,* 239 F. Supp. 531 (SDNY 1965).[11] Similarly, a man who, in an adulterous affair, fathers a child outside his marriage cannot be the "parent" of that child, but his wife may petition as stepparent. *Matter of Stultz,* 15 I. & N. Dec. ―― (1975).

That the statute is underinclusive is also undisputed. Brief for Appellees 17; Tr. of Oral Arg. 21. Indeed, the Government could not dispute it in view of the close relationships exhibited in appellants' cases, recognized in our previous cases, see, *e. g.,* *Trimble* v. *Gordon, ante,* p. 762; *Weber* v. *Aetna Casualty & Surety Co., supra,* at 169; *Stanley* v. *Illinois, supra,* and established in numerous studies.[12]

The Government suggests that Congress may have decided to accept the inaccurate classifications of this statute because they considered a case-by-case assessment of closeness and

---

[11] The Immigration and Naturalization Service (INS) seeks to add a gloss, in such cases, requiring, in addition to the marriage between the petitioner and the father of the illegitimate, some indicia of a "close family unit." *Matter of Harris,* 15 I. & N. Dec. ―― (1970). The phrase has not been defined but we know that it includes a situation where the father, stepmother, and child have lived together at some time, *Matter of The,* 11 I. & N. Dec. 449 (1965), and excludes the case where neither father nor stepmother ever lived with or cared for the child. *Matter of Harris, supra; Matter of Amado and Monteiro,* 13 I. & N. Dec. 179ʹ (1969); *Matter of Soares,* 12 I. & N. Dec. 653 (1968); *Matter of Morris,* 11 I. & N. Dec. 537 (1966). The only court to review this interpretation has rejected the added gloss. The fact of the marriage is sufficient to categorize the wife as "stepmother." *Andrade* v. *Esperdy,* 270 F. Supp. 516 (SDNY 1967).

[12] Chaskel, Changing Patterns of Services for Unmarried Parents, 49 Social Casework 3 (1968); Chaskel, The Unmarried Mother: Is She Different? 46 Child Welfare 65, 72 (1967); Herzog, Some Notes About Unmarried Fathers, 45 Child Welfare 194 (April 1966); Knight, Conferences for Pregnant Unwed Teen-Agers, 65 American Journal of Nursing 123, 126 (1965); Sauber, The Role of the Unmarried Father, 4 Welfare in Review 15, 16 (Nov. 1966); Wessel, A Physician Looks at Services for Unmarried Parents, 49 Social Casework 11 (1968).

paternity not worth the administrative costs. This attempted justification is plainly inadequate. In *Stanley* v. *Illinois, supra,* we expressed our low regard for the use of "administrative convenience" as the rationale for interfering with a father's right to care for his illegitimate child.

> "Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." 405 U. S., at 656–657.

See also *Glona* v. *American Guarantee & Liability Ins. Co., supra.*

This Court has been equally intolerant of the rationale when it is used to deny rights to the illegitimate child. While we are sensitive to " 'the lurking problems with respect to proof of paternity,' " *Trimble* v. *Gordon, ante,* at 771, quoting *Gomez* v. *Perez,* 409 U. S. 535, 538 (1973), we are careful not to allow them to be " 'made into an impenetrable barrier that works to shield otherwise invidious discrimination.' " *Trimble, ante,* at 771. We require, at a minimum, that the " 'statute [be] carefully tuned to alternative considerations,' " *ante,* at 772, quoting *Mathews* v. *Lucas,* 427 U. S., at 513, and not exclude all illegitimates simply because some situations involve difficulties of proof. *Ibid.*

Given such hostility to the administrative-convenience argument when invidious classifications and fundamental rights are involved, it is apparent that the rationale is inadequate in the present case. As I observed earlier, since Congress gave no indication that administrative costs were its concern we should scrutinize the hypothesis closely. The likelihood of such a rationale is diminished considerably by the comprehensive and elaborate administrative procedures

already established and employed by the INS in passing on claims of the existence of a parent-child relationship. All petitions are handled on a case-by-case basis with the petitioner bearing the burden of proof. Moreover, the INS is no stranger to cases requiring proof of paternity. When, for example, a citizen stepmother petitions for the entrance of her husband's illegitimate child, she must necessarily prove that her husband is the child's father.[13] Indeed, it is ironic that if Mr. Warner marries and his wife petitions for Serge, her proof will, in fact, be one step more complex than his would be—not only must she prove his paternity, but she must also prove their marriage. Nevertheless, she would be entitled to an opportunity to prove those facts; he is not.

Nor is a fear of involvement with foreign laws and records a persuasive explanation of the omission. In administering the Act with respect to legitimated children, for example, the critical issue is whether the steps undertaken are adequate under local law to render the child legitimate, and the INS has become expert in such matters.[14] I note, in this connec-

---

[13] The easiest proof is a birth certificate that names the father. Review of Immigration Problems: Hearings on H. R. 10993 before the Subcommittee on Immigration, Citizenship, and International Law of the House Committee on the Judiciary, 94th Cong., 1st and 2d Sess., 150–151, 154 (1975–1976). Alternatively, the INS obtains affidavits from the natural mother or other people familiar with the relationship, looks at school documents which may name the father, and considers facts of custody or support. *Ibid.* The INS also relies on local judicial determinations if they exist, but it does not require them because "alternative administrative recognition procedures . . . normally available to the natural father . . . are less cumbersome and time consuming and are regarded by consular officers as equally reliable with court determinations in eliminating fraudulent claims to the paternal relationship." *Id.*, at 151.

[14] The variations are many. In some countries legitimation may be accomplished only by marriage of the natural parents, *Matter of Blancaflor*, 14 I. & N. Dec. 427 (1973) (Philippines); *Matter of F*, 7 I. & N. Dec. 448 (1957) (Portugal); *Matter of W*, 9 I. & N. Dec. 223 (1961) (Surinam); *Matter of J*, 9 I. & N. Dec. 246 (1961) (British Guiana); *Matter of C*,

tion, that where a child was born in a country in which all children are legitimate,[15] proof of paternity is the critical issue and the proof problems are identical to those involved with an illegitimate child.

Given the existence of these procedures and expertise, it is difficult indeed to give much weight to the hypothesized administrative-convenience rationale. Moreover, as noted previously, this Court will not allow concerns with proof to justify "an impenetrable barrier that works to shield otherwise invidious discrimination." *Gomez, supra,* at 538. As the facts of this case conclusively demonstrate, Congress has "failed to consider the possibility of a middle ground between the extremes of complete exclusion and case-by-case determination of paternity." *Trimble, ante,* at 770–771. Mr. Warner is a classic example of someone who can readily prove both paternity and closeness. Appellees concede this. Tr. of Oral Arg. 21–22. The fact that he is denied the opportunity demonstrates beyond peradventure that Congress has failed to " 'carefully tun[e] [the statute] to alternative considerations.' " *Trimble, ante,* at 772, quoting *Mathews* v. *Lucas,* 427 U. S., at 513. That failure is fatal to the statute. *Trimble, ante,* at 772–773.[16]

---

9 I. & N. Dec. 597 (1962) (Spain); by court decree, *Matter of J and Y,* 3 I. & N. Dec. 657 (1949); *Matter of Duncan,* 15 I. & N. Dec. —— (I. D. 2373, 1975) (Liberia); or by formal recognition, *Matter of K,* 8 I. & N. Dec. 73 (1958) (Poland); *Matter of Jancar,* 11 I. & N. Dec. 365 (1965) (Yugoslavia); *Matter of G,* 9 I. & N. Dec. 518 (1961) (Hungary); *Matter of Peters,* 11 I. & N. Dec. 691 (1966) (Virgin Islands); *Matter of Sinclair,* 13 I. & N. Dec. 613 (1970) (Panama); *Matter of Kubicka,* 14 I. & N. Dec. 303 (1972) (Poland); *Matter of Coker,* 14 I. & N. Dec. 521 (1974) (Nigeria); *Matter of Kim,* 14 I. & N. Dec. 561 (1974) (Korea). In some countries a child born out of wedlock is deemed the legitimate child of both parents, *Matter of G, supra;* cf. *Matter of Lo,* 14 I. & N. Dec. 379 (1973) (People's Republic of China).

[15] See, *e. g., Matter of G, supra; Matter of Lo, supra.*

[16] Since resident aliens are also not to be arbitrarily denied privileges on the basis of gender and legitimacy, *Hampton* v. *Mow Sun Wong,*

## IV

When Congress grants a fundamental right to all but an invidiously selected class of citizens, and it is abundantly clear that such discrimination would be intolerable in any context but immigration, it is our duty to strike the legislation down. Because the Court condones the invidious discrimination in this case simply because it is embedded in the immigration laws, I must dissent.

MR. JUSTICE WHITE also dissents, substantially for the reasons stated by MR. JUSTICE MARSHALL in his dissenting opinion.

---

426 U. S. 88 (1976); *Sugarman* v. *Dougall*, 413 U. S. 634 (1973); *Graham* v. *Richardson*, 403 U. S. 365 (1971), it is clear that appellants Earl and Trevor Wilson, if they meet the terms of the saving clause of the 1976 Amendments, should also be entitled to relief. See n. 5, *supra.*