# Constitutionality of Legislation Authorizing Permanent Resident Status for Certain Nonimmigrant Aliens

Legislation which would grant permanent residence status to certain nonimmigrant alien workers residing in the Virgin Islands, and at the same time restrict these individuals' ability to obtain the entry of relatives under otherwise applicable provisions of the Immigrant and Nationality Act, does not violate the Equal Protection Clause.

The application of the equal protection principle to aliens is subject to the special powers of Congress over immigration and naturalization, and even the constitutional rights of citizens must yield where they clash with the paramount power of Congress over the admission and exclusion of aliens.

August 24, 1981

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, IMMIGRATION AND NATURALIZATION SERVICE

This responds to your request for our opinion regarding the constitutionality of H.R. 3517 (97th Cong. 1st Sess.), particularly § 2(c)(2) & (3). H.R. 3517 would provide generally that certain persons originally admitted temporarily to the Virgin Islands as nonimmigrant alien workers under § 101(a)(15)(H)(ii) of the Immigration and Nationality Act (Act) 8 U.S.C. § 1101(a)(15)(H)(ii) (H-2 workers), may have their status adjusted to that of aliens lawfully admitted for permanent residence. The bill, would, as will be explained, restrict the ability of its beneficiaries to facilitate the immigration of some of their relatives under the preference provisions of § 203 of the Act. Your inquiry is addressed to the consitutionality of those restrictions. It is our conclusion that the courts would uphold the constitutionality of § 2(c)(2) & (3).

### I.

The background of the bill, as explained in the testimony of Associate Commissioner Carmichael of the Immigration and Naturalization Service (INS) before the House Judiciary Committee, is as follows: In the 1950s and 1960s during an acute labor shortage in the Virgin Islands, over 13,000 alien workers entered the Virgin Islands under the H-2 program. Most of those workers left the Virgin Islands during the 1970s, but about 2000 of them and their dependents remain there. Although they were admitted as temporary workers, their work has been of a permanent nature and over the years they have made valuable

271

contributions to the economy of the Virgin Islands. Moreover, having lived in the United States for long periods, they have raised families there and those of their children who were born on United States soil are American citizens. The bill would permit the adjustment of the status of those H-2 workers who have resided continuously in the Virgin Islands for the past six years and of their spouses and foreign born children to that of aliens lawfully admitted for permanent residence.

It is estimated that the enactment of the bill would result in the adjustment of the status of less than 5600 persons who have resided in the Virgin Islands for considerable periods of time. Hence, the change of their status from nonimmigrant to lawfully admitted for permanent residence, as such, is not likely to create any appreciable ethnic or social dislocation, even in a small island community such as the Virgin Islands, which has slightly less than 100,000 inhabitants.

In the past, legislation such as H.R. 3517 has apparently been impeded by the prospect that, after the status of the H-2 workers has been adjusted to that of aliens lawfully admitted for permanent residence, their frequently large families living abroad could enter the United States under the immediate relative provisions of § 201 [1] or under the preference provisions of § 203 of the Act,[2] and settle in the same area in which their sponsors live. Moreover, once a relative is lawfully admitted for permanent residence, he in turn may file second preference petitions for his spouse and unmarried sons and daughters. This secondary, and potentially snowballing, effect of the regularization of the status of H-2 workers could result in the influx of a substantial number of aliens into the Virgin Islands—possibly greater than the number of those whose status would be adjusted under the bill, and in contrast to the adjustment of status of the long-time resident H-2 workers and their families, is likely to create serious ethnic, social, and financial problems.[3]

According to the opening clause of § 2(c)(2), the bill would seek "to alleviate the possible adverse impact of immigration into the Virgin Islands of the United States by relatives of aliens who have had their status adjusted" under the legislation by curtailing the availability of the preference provisions of § 203 to the relatives of those who had their status adjusted under the provisions of the bill.

---

[1] Immediate relatives, i.e., minor unmarried children, parents, and spouses, of citizens of the United States may be admitted to the United States without being counted against the numerical limitations 8 U.S.C. § 1151(b).

[2] The preference provisions pertinent to this memorandum are second preference: the spouse and unmarried sons and daughters of aliens lawfully admitted for permanent residence; fourth preference: married sons and daughters of citizens of the United States; and fifth preference. brothers and sisters of citizens of the United States. 8 U.S.C. § 1153(a)(2), (4), (5).

[3] This problem is one which has prevented the adjustment of the status of H-2 workers on Guam, and resulted in the postponement of the extension of the Act to the Northern Mariana Islands. See Covenant with the Northern Mariana Islands § 503(a), 48 U.S.C. § 1681 note.

Section 2(c)(2) would authorize the Secretary of State to curtail the number of visas available to those for whom second preference petitions[4] are filed by an alien whose status has been adjusted pursuant to the provisions of the bill. Section 2(c)(3)(A) would provide that no alien may receive an immigrant visa by virtue of a fourth or fifth preference petition[5] filed by a citizen of the United States who had his status adjusted under the bill, unless the citizen is physically present and has resided continuously for at least two years in a state, or unless the Attorney General makes a finding of exceptional and extremely unusual hardship. Finally, the complex language of § 2(c)(3)(B) provides in effect that if a person whose status was adjusted under the bill secures after his naturalization the admission of a parent as an immediate relative under § 201, that parent cannot file a second preference petition for an unmarried son or daughter.[6]

## II.

In evaluating the constitutionality of these restrictions on the preference provisions of § 203, we begin with two propositions: first, no alien has the constitutional right to enter the United States, *Kleindienst* v. *Mandel*, 408 U.S. 753, 762 (1972), and second, no citizen has the constitutional right to have his relatives admitted to the United States. *Fiallo* v. *Bell*, 430 U.S. 787 (1977).

While the ability to facilitate the immigration of close relatives is not a constitutional right, it constitutes a valuable statutory benefit.[7] This raises the question whether the ability of citizens to file fourth and fifth preference petitions, generally available to all citizens, may be denied to some citizens because their status has been adjusted under the provisions of this bill,[8] and whether the ability to file second preference petitions, generally available to all aliens lawfully admitted for permanent residence, may be curtailed to some aliens because they or their sponsors had their status adjusted under the provisions of the bill. While the Fifth Amendment to the Constitution does not contain an express Equal Protection Clause, it does forbid discrimination which amounts to a denial of due process. *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954).

---

[4] *I.e.*, spouses and unmarried sons and daughters of aliens lawfully admitted for permanent residence

[5] *I.e.*, married sons and daughters and brothers and sisters of citizens of the United States.

[6] The apparent reason for this provision is that unmarried sons and daughters would be the brothers or sisters of the citizen who, under § 2(c)(3)(A), cannot be admitted under a fourth or fifth preference petition unless the citizen has resided in a state for at least two years.

[7] The distinction between rights and privileges has been rejected by the Court. *See Graham* v. *Richardson* 403 U.S. 365, 374 (1971); *Morrissey* v. *Brewer*, 408 U.S. 471, 481 (1972)

[8] The bill does not deprive a citizen absolutely of his ability to file fourth and fifth preference petitions, but conditions it on his giving up his residence in the Virgin Islands. The right to maintain the residence of his choice appears to be the logical correlative of the basic constitutional freedom to travel. *Memorial Hospital* v. *Maricopa County*, 415 U.S. 250, 254 (1974).

## A.

The application of the equal protection principle to aliens, even those lawfully admitted for permanent residence, is subject to the special powers of Congress over immigration and naturalization. The Court observed in *Mathews* v. *Diaz,* 426 U.S. 67, 80 (1976), that under those powers "Congress regularly makes rules that would be unacceptable if applied to citizens," and upheld legislation which discriminated against aliens and among different classes of aliens lawfully admitted for permanent residence. *Ibid.* The Court also expressed its "special reluctance" to question the exercise of congressional judgment in this field. *Id.* at 84. We believe that § 2(c)(2) and § 2(c)(3)(B), relating to second preference petitions filed by aliens lawfully admitted for permanent residence, would be held constitutional under the Court's analysis because Congress' attempt to deal with this particular situation in the manner contemplated is surely reasonable.

## B.

Section 2(c)(3)(A), which relates to fourth and fifth preference petitions filed by citizens of the United States, raises constitutional issues of a different nature. *Schneider* v. *Rusk,* 377 U.S. 163, 165–66 (1964), reaffirmed the basic rule, going back to *Osborn* v. *Bank of the United States,* 22 U.S. (9 Wheat.) 738, 827 (1824), and embodied in the Fourteenth Amendment, that, with the exception to the qualification for the Presidency, the rights of naturalized citizens are of the same dignity and coextensive with those of native born citizens. Basically, every naturalized citizen has the same stature under our Constitution as every other citizen, whether native born or naturalized.

Equal protection claims, however, are subject to the power of Congress to make differentiations for justifiable reasons, to further important governmental objectives, or to advance legitimate state interests. *Bolling* v. *Sharpe,* 347 U.S. 497, 499 (1954); *Schneider* v. *Rusk, supra,* at 168; *Craig* v. *Boren,* 429 U.S. 190, 197 (1976); *Califano* v. *Webster,* 430 U.S. 313, 316–17 (1977); *Duke Power Co.* v. *Carolina Environmental Study Group,* 438 U.S. 59, 84–94 (1978); *Vance* v. *Bradley,* 440 U.S. 93, 97 (1979). The purpose of the discriminatory provision of § 2(c)(3)(A) is, as explained above, to prevent a substantial surge of immigration into the Virgin Islands some five to seven years after the enactment of the bill when the H-2 workers, whose status would be adjusted under the bill, will have become naturalized citizens and will be able to file fourth and fifth preference petitions. In view of the general reluctance of the courts to reexamine congressional policies in the field of immigration, *Galvan* v. *Press,* 347 U.S. 522, 531–32 (1954); *Fiallo* v. *Bell,* 430 U.S. 787, 792–796 (1977), we believe the courts should and would recognize the congressional determination that § 2(c)(3)(A) serves an important

274

governmental purpose,[8] and, on that basis, reject any constitutional challenge to that provision.

In addition, even constitutional rights of citizens must yield where they clash with the paramount power of Congress over the admission and exclusion of aliens. *Kleindienst* v. *Mandel, supra,* at 762, held that the power of Congress to deny admission to what it considers to be undesirable aliens prevails over a citizen's First Amendment right to "receive information and ideas." *Fiallo* v. *Bell, supra,* comes even closer to the issue here involved. In that case fathers of illegitimate children claimed that the provisions of the Act pursuant to which they were precluded from obtaining the entry of their illegitimate children as immediate relatives under § 201(a) of the Act, while mothers were permitted to do so, constituted an unjustifiable discrimination based on the sex of the citizen parent. The Court held, in effect, that this argument was irrelevant as against the plenary powers of Congress to define the classes of aliens who may be admitted. 430 U.S. at 792, 794, 795, and n.6.

Based on the foregoing analysis, we are satisfied that the courts will uphold the constitutionality of § 2(c)(3)(A).

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[8] It should be noted that in contrast to § 2(c)(2), § 2(c)(3)(A) does not contain a recital of the purpose it is designed to accomplish. Nor are we aware of any congressional finding to the effect that the filing of fourth and fifth preference petitions by citizens whose status has been adjusted by the bill is more likely to have an adverse impact on the Virgin Islands than the filing of like petitions by other citizens of the United States. We strongly recommend the inclusion of such findings in the legislation or its legislative history in order to lessen the prospect that judicial inquiry into the legitimacy of the governmental purpose served by the bill would lead to a finding of unconstitutionality